OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(No. 78-182—Decided December 7, 1978.)

320

*Mr. William ;A. Spratley*, consumers' counsel, and *Mr. Orla E. Collier*, for appellant.

*Mr. William J. Brown*, attorney general, *Mr. Marvin I. Resnik* and *Mr. John W. Rudduck*, for appellee.

*Mr. Russell J. Spetrino* and *Mr. Anthony J. Alexander*, for intervening appellee, The Ohio Edison Company.

*Per Curiam*. The questions before this court concern the validity of fuel cost adjustment charges made by the Ohio Edison Company to its customers.

. . Appellant contends initially that the commission is precluded from allowing the pass-through of acquisition and delivery costs of purchased power.pursuant to a fuel cost adjustment clause. He supports this contention by the "unambiguous and unequivocal" language of R. C. 4905.01(G), (E) and (F). R. C. 4905.01(G) provides:

. " 'Fuel cost adjustment clause' means a provision in

a schedule of an electric light company that requires the company to * * * adjust the rates that it charges its customers, in accordance with any fluctuation in *delivery* and *acquisition costs* * * *.'' (Emphasis added.)

Delivery and acquisition costs are defined in R. C. 4905.01(E) and (F), respectively:

''(E) 'Delivery cost' means the cost of delivery of fuel, to be used for the generation of electricity, from the site of production directly to the site of an electric generating facility.

''(F) 'Acquisition cost' means the cost to an electric light company of acquiring the title of fuel to be used for the generation of electricity. * * * Such term does not embrace any associated cost including, but not limited to, delivery cost, the cost of handling the fuel after its delivery to such facility, the cost of such processing, readying, or refinement of the fuel as may be necessary in order to use the fuel to generate electricity or the cost of disposing of any residue of such fuel after it has been so used.''

Appellant argues essentially that the words ''purchased power'' do not appear in these definitions. While this is true, it is not dispositive of the issue. R. C. 4905.01 does not limit recoverable fuel costs under a fuel cost adjustment clause to the utility that generates electricity. Its scope is far broader. The statute merely states that the cost of acquiring title to, and delivery of, fuel is recoverable under a fuel cost adjustment clause. Normally these costs would be passed directly to serviced customers as an expense of the utility which generates the electricity. However, when a generating utility sells electricity to another utility, as here, the purchasing utility must bear the acquisition and delivery costs as part of the purchase price. These costs have not ceased to exist upon sale; they have merely been incorporated in the price paid for the electricity. Customers of the purchasing utility who receive the benefit of these fuel expenditures are, in fact, charged for the acquisition and delivery costs of the generating utility, via the purchasing utility, which the statute

322

permits. Accordingly, this court finds that the definitions of "delivery cost" and "acquisition cost" in R. C. 4905.01 (E) and (F) do not bar inclusion of these costs in the fuel cost adjustment clause of a utility which absorbs the same costs through the purchase of electricity from a generating utility.

The appellant next challenges the authority of the commission to permit the company to include the entire cost of energy purchased on an economic dispatch basis in its fuel cost adjustment charges.

The pass through of total energy costs is allowed by the commission pursuant to Rules 4901:1-11-01(D) and 4901:1-11-02(I) of the Ohio Adm. Code, only if, among other requirements, the *total energy cost* per kilowatt-hour of purchased energy is less than the incremental *fuel cost* per kilowatt-hour of the purchasing utility's own generation which the purchase has displaced. The purpose of this provision is to encourage utilities to purchase power where the net effect is to reduce fuel costs of the utility and electricity costs of the consumer. The authority to adopt a rule that achieves this objective is found in R. C. 4905.69, which provides, in part:

"The public utilities commission shall promulgate a rule that:

"* * *

"(C) Establishes incentives, in terms of costs that may be recovered by electric light companies pursuant to a fuel cost adjustment clause for the implementation and employment by such companies of efficient fuel procurement and utilization practices."

Appellant argues essentially that: (1) this statute authorizes the commission to adopt a rule related to "fuel procurement * * * practices," not to purchases of power; (2) alternatively, the statute at most delegates to the commission authority to establish incentives in terms of *acquisition and delivery costs* recoverable under a fuel cost adjustment clause, not *entire energy costs*; (3) the rules fail to establish the "incentive" required by R. C. 4905.69(C) be-

cause the company is required by another rule to act similarly; and (4) R. C. 4933.26 prohibits a utility from charging its customers for more than acquisition and delivery costs.

Appellant's first contention is misdirected. The commission's rules do, in fact, deal directly with "fuel procurement * * * practices" by discouraging fuel purchases when power can be bought at less expense. It is difficult to conceive of a more direct way to promote efficient fuel procurement practices than by dissuading utilities from making uneconomical purchases.

Appellant's alternative argument, that the statute speaks only in terms of acquisition and delivery costs, finds no support in the language of R. C. 4905.69(C). The statute speaks in terms of "costs," not "acquisition and delivery costs." The fact that this permits the passage of other than acquisition and delivery costs through a fuel cost adjustment clause does no disservice to R. C. 4905.-01(G), the definitional provision of fuel cost adjustment clause, since the costs passed pursuant to R. C. 4905.69(C) are intended by that statute as a substitute for acquisition and delivery costs, a substitute beneficial to both the utility and the customers. Appellant's argument is not well taken.

In his third contention, appellant argues that Rules 4901:1-11-01(D) and 4901:1-11-02(I), Ohio Adm. Code, are unlawful for failure to establish incentives as required by 4905.69(C). Rule 4901:1-11-01(F) provides as follows:

"In procuring its fuel, and in operating its generation, dispatch, transmission, and distribution systems, each electric utility shall attempt to operate at a minimum overall cost, taking into consideration the utility's voltage, frequency, reliability, safety, environmental, and service quality requirements, as well as the utility's existing contractual obligations."

The clear import of this rule requires utilities to attempt to operate at minimum costs for the benefit of customers. Rules 4901:1-11-01(D) and 4901:1-11-02(I) detail a procedure which facilitates meaningful implementation of

the above-quoted rule by permitting utilities to pass on purchase costs in situations where they otherwise could not. The fact that a utility can reduce costs by taking advantage of the disputed rules is strong incentive for a utility to do more than *attempt* to operate at a minimum overall cost," *i. e.*, the economic benefits conferred by these rules encourage more than nominal compliance with Rule 4901:1-11-01 (F). Appellant's argument is without merit.

Appellant's final challenge to the company's practice of passing purchase costs to customers via a fuel cost adjustment clause is that such charges are not permitted by R. C. 4933.26, which provides:

"(A) As used in this section 'delivery cost' and 'acquisition cost' shall have the meaning set forth in section 4905.01 of the Revised Code.

"(B) Each electric light company shall indicate separately and conspicuously on each customer bill:

"(1) The total charge in dollar and cents attributable to the delivery and acquisition costs of fuel;

"(2) The charge attributable to the delivery and acquisition costs of fuel expressed in cents per kilowatt hour;

"(3) The change in the charge attributable to delivery and acquisition costs of fuel from the previous month expressed in cents per kilowatt hour.

"The above charges shall include only those amounts attributable to the delivery and acquisition costs of fuel represented by the customer's current monthly usage.

"Nothing in this section shall be construed to mean that an electric light company operated not for profit or one that is owned or operated by a municipal corporation is subject to this section."

Nowhere in the statute is there language that acquisition and delivery costs are the only charges allocable to customers. The statute merely specifies how these specific charges shall be made. Accordingly, this court finds that the company's charges to its customers of power purchased on an economic dispatch basis pursuant to a fuel cost adjustment clause were lawful.

Appellant alleges in his final argument that the com-

pany overcharged its customers by accepting inferior quality coal at contract price, in violation of Rule 4901:1-11-07, Ohio Adm. Code. The rule requires the commission to exclude from a utility's fuel charges any increased costs from a supplier's failure to fulfill its contract obligations "* * * unless the utility has submitted evidence, satisfactory to the Commission, of the utility's efforts to obtain performance and to recover damages resulting from non-performance."

The record indicates that the supplier's coal comes from one of the country's more abundant coal seams, and that the company had an interest in maintaining a dealing relationship with the supplier in the hope that future transactions could be arranged as to adjacent coal-rich property. The record also indicates that when the contract was entered into by the company and supplier, both parties suspected that the coal to be delivered might fall below written specifications due to the uncertain effect of the Federal Mine Health and Safety Act on mining operations. Any damages caused by the alleged breach are conceded by appellant to be minimal.

These facts are not unusual. They represent a common situation whereby business interests transcend possible legal rights. The company here looked beyond the immediate contract, perhaps to the neglect of dubious legal rights, but for the sake of future business concerns. This is not an unreasonable practice.

Recognition of this business reality must be implicit in Rule 4901:1-11-07. It is not the province of third parties to compel lawsuits by a utility concerning the utility's rights, where reasonable business justification exists to support abstention from such legal recourse. Indeed, were such lawsuits required, far greater damage could be caused by the impairment of advantageous business relationships than by the relinquishment of a financially insignificant legal remedy. For this reason, this court finds that Rule 4901:1-11-07 implicitly grants a utility the discretion to determine whether it is in the best interest of the utility to pursue possible legal rights against a supplier when overriding

business concerns may be present. The commission found that the utility acted reasonably under the circumstances, a finding supported by the record. The order of the commission must therefore be affirmed. *Worthington Hills Civic Assn.* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 11.

Accordingly, the order of the commission being reasonable and lawful, is hereby affirmed

*Order affirmed.*

LEACH, C. J., HERBERT, P. BROWN and SWEENEY, JJ., concur.

CELEBREZZE, J., concurs in the judgment.

W. BROWN and LOCHER, JJ., dissent.

LOCHER, J., dissenting in part. The fuel cost adjustment clause is a provision in the rate schedule of an electric utility that requires the company to adjust the rates it charges to customers in accordance with any fluctuation in the *delivery and acquisition costs* of fuel used to generate electricity. R. C. 4905.01(G). Thus, crucial to the passing of costs through a fuel cost adjustment clause is that they be either an acquisition cost or a delivery cost. Delivery cost is defined as "the cost of delivery of fuel, to be used for the generation of electricity from the site of production directly to the site of an electric generating facility." R. C. 4905.01(E). Acquisition cost is defined to mean "the cost to an electric light company of acquiring the title of fuel to be used for the generation of electricity." R. C. 4905.01(F). This definition continues to specifically state that acquisition cost does not embrace any associated cost. The maxim *expressio unius est exclusio alterius* is applicable in the construction of statutes. By expressing what costs may be included in the fuel cost adjustment clause the General Assembly's intent to exclude all other costs is apparent.

It is uncontroverted that the non-fuel cost of economic dispatch power is neither an acquisition cost nor a delivery cost. The commission's inclusion in the fuel cost adjustment clause in Rule 4901:1-11-02(I), Ohio Adm. Code, of

this non-fuel cost of economic dispatch power is purportedly authorized by R. C. 4905.69(C). R. C. 4905.69 provides, in relevant part:

"The public utilities commission shall promulgate a rule that:

"* * *

"(C) Establishes incentives, in terms of costs that may be recovered by electric light companies pursuant to a fuel cost adjustment clause for the implementation and employment by such companies of efficient fuel procurement and utilization practices."

R. C. 4905.69(C) must be read *in pari materia* with R. C. 4905.01. Fuel costs which may be passed through the fuel cost adjustment clause are only delivery cost and acquisition cost. R. C. 4905.69(C) does not vest in the commission the authority to declare null and void the statutory limitations pronounced by the General Assembly. The only consistent interpretation of R. C. 4905.69(C) is that it permits the commission to promulgate rules to create incentives in terms of the costs that may be statutorily recovered, not the recovery of costs in addition to delivery and acquisition costs.

The pass through of the total cost of economic dispatch power, while it may be *reasonable* with respect to efficient fuel utilization, is *unlawful* under the present statutory scheme. The commission is simply not authorized to rewrite the statutory provisions as it deems proper. The majority's finding has started the erosion of the sound principle expressed in *Ohio Power Co.* v. *Pub. Util. Comm.* (1978), 54 Ohio St. 2d 342, 344, that:

"* * * Fuel adjustment clauses are not and may not be permitted to become a carte-blanche authorization to an electric utility to pass through to its tariff customers expenses other than fuel cost fairly attributable to the production of the service to those customers. * * *"

Accordingly, I must respectfully dissent.

W. Brown, J., concurs in the foregoing dissenting opinion.