Utilities Comm. v. Power Co.

STATE OF NORTH CAROLINA ex rel UTILITIES COMMISSION v. VIR-
GINIA ELECTRIC AND POWER COMPANY

No. 8010UC29

(Filed 29 August 1980)

1. Electricity § 3; Utilities Commission § 24— rate change based on change in fuel
   cost – heat rate – plant availability – consideration by Utilities Commission
   improper

   Pursuant to G.S. 62-134(e) a public utility may apply to the Utilities
   Commission for authority to increase its rates and charges based solely upon
   the increased cost of fuel used in the generation of electric power, and the
   Commission, on its own motion or upon request of an interested rate payor,
   may consider and determine a decrease in rates or charges based solely upon
   a decrease in the cost of fuel; therefore, insofar as the Commission in the
   present cases considered and passed upon the cost of fuel used by defendant
   in the generation of electric power during the periods in question by con-
   sidering the reasonableness of the prices paid by defendant for such fuel, it
   acted within the scope of the statutorily prescribed procedure, but insofar as
   the Commission considered and based its determination upon such factors as
   defendant's heat rate and plant availability in these proceedings, it went
   beyond the scope of the procedure authorized by G.S. 62-134(e).

2. Electricity § 3; Utilities Commission § 24— rate change based on fuel cost – heat
   rate and plant availability defined – factors to be considered in general rate
   case

   Heat rate describes the ratio between the amount of heat, expressed in
   Btu's, required to produce a kilowatt-hour of electrical energy, and "plant
   availability," in the context of these proceedings, refers to the extent to
   which a particular electrical generating unit is available to produce electric-
   ity during a given period of time and is also expressed in terms of a ratio,
   called the "capacity factor," representing the relationship between actual
   generation of electricity from that unit during a given period of time to the
   theoretical maximum possible generation during the same period. Heat rate
   and capacity factor furnish convenient measuring devices by which to evalu-
   ate the overall efficiency with which a particular electrical utility system is
   operated, and the Utilities Commission should take into account the efficien-
   cy of a company's operation in fixing its rates in a general rate case as
   provided in G.S. 62-133, but plant efficiency as it bears upon fuel cost is not a
   factor to be considered in the limited and expedited proceeding provided for
   by G.S. 62-134(e).

APPEAL by Virginia Electric and Power Company (Vepco),
respondent in Docket No. E-22, Sub 236 and applicant in Docket
Nos. E-22, Sub 239 through Sub 244, from order of the Utilities
Commission dated 31 July 1979 entered in said Dockets, and

appeal by Vepco, applicant, from order of the Utilities Commission dated 24 August 1979 entered in Docket E-22, Sub 246.

On 18 September 1978 the North Carolina Utilities Commission instituted Docket No. E-22, Sub 236 by issuing its "Order of Investigation" into "the underlying causes for the high cost of service of Vepco resulting in substantially higher electric rates in North Carolina in its service area than the electric rates in the service areas of other electric utilities in North Carolina." The order listed the following six specific factors contributing to Vepco's cost of service to be investigated:

1. The allocation formulae and procedures that have been used in assigning Vepco's generation and transmission plant and system operating costs between its wholesale and retail service, respectively, in West Virginia, Virginia, and North Carolina, the three states which Vepco serves.

2. The high cost of meeting air pollution standards for Vepco's generating plant in the Washington, D.C., air quality areas, and its possible effect on North Carolina retail consumers.

3. The reasonableness of Vepco's heavy dependence upon high cost oil-fired generation of electricity as compared to the lower cost generation by Duke Power Company (DUKE) and Carolina Power and Light Company (CP&L) from coal-fired and nuclear generators.

4. The reasonableness of the load factor experienced by Vepco in the utilization of its generation plant.

5. The efficiency and line losses incurred in serving North Carolina from generating plants located in Virginia and West Virginia.

6. Vepco's high cost of construction of recent new generating plants.

In addition, the order directed:

7. Investigation of all other factors which may cause the disparity between Vepco's retail rates in the 22 counties served by Vepco in North Carolina and the areas of North Carolina served by other electric utilities.

The Commission requested its Public Staff to conduct the investigation and report its findings and ordered Vepco to file its response.

On 22 January 1979 the Public Staff filed its report and Vepco filed its response. Thereafter, public hearings were held in four towns in Vepco's service area and in Raleigh on dates between 24 April and 11 May 1979, at which witnesses presented by the Public Staff and by Vepco, as well as public witnesses, appeared and testified. On 1 July 1980 the Public Staff and Vepco filed briefs and proposed orders.

During the pendency of the foregoing proceedings in Docket No. E-22, Sub 236, Vepco filed applications pursuant to G.S. 62-134(e) for adjustments in its rates based solely on changes in cost of fuel. These included applications for such adjustments for each of the months of February through July 1979, which were designated Docket Nos. E-22, Sub 239 through Sub 244 inclusive. (The filing in Docket No. E-22, Sub 244 also requested authority to increase the fuel component of its basic rates to be in effect during the billing months of July through December 1979.) In each case the Public Staff proposed adjustments to reflect the disallowance of certain fuel costs, and in each proceeding Vepco filed an "Undertaking to Refund" the difference between the fuel adjustment factor approved by the Commission and the factor as calculated by the Public Staff, pending the outcome of the investigation being conducted on Docket No. E-22, Sub 236, subject, however, to judicial review.

On 31 July 1979 the Commission entered its order in combined Docket No. E-22, Sub 236 and Sub 239 through Sub 244, inclusive, entitled "Order Reducing Allowed Fuel Cost to Reasonable Levels and Directing Refunds." In this order the Commission ordered Vepco to make refunds in Docket No. E-22, Sub 239 through 244, based primarily on its finding:

17. That Vepco's fuel expenses are excessive and should be adjusted in these and future proceedings to remove unreasonable costs associated with poor system fossil-fired heat rate and low availability at the Mt. Storm station and Chesterfield Units 5 and 6.

The Commission also found in this order that Vepco's management had acted imprudently by not pursuing a program to effect the reconversion of five of its oil-fired generating units to coal and directed that "effective January 1, 1981, Vepco's rates for North Carolina retail electric service should be adjusted to remove excess expenses associated with oil-fired generation" from these five units.

Vepco filed exceptions to the Commission's 31 July 1979 order entered in the dockets above referred to and gave notice of appeal from that order to the Court of Appeals.

On 31 July 1979 Vepco filed its application pursuant to G.S. 62-134(e) to adjust its rates based solely on the cost of fuel for the billing month of September 1979, which application was given Docket No. E-22, Sub 246. On 24 August 1979 the Commission entered its order in that proceeding, applying the same heat rate and availability adjustments which it had used in its 31 July 1979 order from which Vepco had already appealed. Vepco filed exceptions to the 24 August 1979 order entered in Docket No. E-22, Sub 246, and appealed from that order to the Court of Appeals.

Vepco's appeal from the 31 July 1979 order entered in the combined Dockets E-22, Sub 236 and 239 through 244, inclusive, and its appeal from the 24 August 1979 order entered in Docket No. E-22, Sub 246, were consolidated for purposes of hearing in the Court of Appeals.

*Joyner & Howison by R.C. Howison, Jr.; and Hunton & Williams by Guy T. Tripp III and Edgar M. Roach, Jr. for Virginia Electric and Power Company, appellant.*

*Jerry B. Fruitt and Paul L. Lassiter for Public Staff, North Carolina Utilities Commission, appellee.*

PARKER, Judge.

In its 31 July 1979 order entered in combined Dockets E-22, Sub 236 (the investigatory proceeding initiated by the Commission) and Dockets E-22, Sub 239 through 244, inclusive (the proceedings brought by Vepco under G.S. 62-134(e) to adjust its rates and charges solely upon the increased cost of fuel used in the generation of electric power), the Commission expressly found that the allocation formulae and procedures used by the Commission in Vepco's general rate case proceedings had correctly allocated Vepco's generation plant and system operating costs between its wholesale and retail service, respectively, in Virginia, West Virginia, and North Carolina. The Commission also found that Vepco's comparatively high rates for electric service in North Carolina were not the result of costs to meet air pollution standards for Vepco's generating plant in the Washington, D.C., air quality area, or of unreasonable load factors, or of unreasonable transmission and line losses, or of inappropriate allocation of losses to Vepco's North Carolina retail operation, or of excessive costs of constructing generating plants. To these findings, all of which relate to matters which were the subject of investigation in the investigatory proceeding, Docket E-22, Sub 236, and all of which were favorable to Vepco, appellant has, of course, taken no exception.

By this appeal, appellant challenges the Commission's finding that "Vepco's fuel expenses are excessive and should be adjusted in these and future proceedings to remove unreasonable costs *associated with poor system fossil-fired heat rate and low availability*" (emphasis added) of certain of its generating plants. Appellant contends that the Commission committed error by taking into account *in proceedings brought under G.S. 62-134(e)*, the factors of "heat rate" and "low availability" of plant as the basis for its determination that appellant's fuel expenses were excessive and should be adjusted. We agree with appellant's contention and accordingly reverse the Commission's orders.

At the outset, we note that the Public Staff initially contended before the Commission that Vepco's fuel expenses were excessive because: (1) Vepco had paid excessive prices for coal

under long-term contracts with Island Creek Coal Company, Laurel Run Mining Company (a Vepco subsidiary), and Appolo Fuels, Inc.; (2) Vepco had not reconverted its oil-fired units to coal as rapidly as it should have; and (3) Vepco was experiencing a poor heat rate and poor availability of its large low-cost coal-fired generating units. As to the first factor, the Commission expressly found as a fact "[t]hat the prices paid for coal under the Island Creek, Laurel Run, and Appolo Fuel contracts for the test periods under consideration herein should not be adjusted." Further, in discussing this finding the Commission said:

> In summary, the Commission concludes that Vepco's long-term coal contracts are reasonable. An examination of Vepco's overall coal procurement activities demonstrates that Vepco's coal purchases compare favorably with those of Duke and CP&L, the utilities chosen by the Public Staff for its comparison. Further, that although the prices paid for coal under the Island Creek, Laurel Run, and Appolo Fuels contracts for the test periods under consideration herein are higher than the Commission would prefer to see, they are not excessive when viewed in the total context of the evidence of record in this proceeding.

As to the second factor, the Commission expressly found "[t]hat since early 1977, Vepco has known with certainty that significant net savings would result from the reconversion to coal-fired generation" of certain of its generating units and "[t]hat, upon passage of the Clean Air Act Amendment in November 1977, timely and responsible action by Vepco's management would have resulted in conversion to coal-fired generation of certain of its oil-fired units . . . *by no later than January 1, 1981.*" (Emphasis added.) On these findings, the Commission expressly refused to consider any tardiness in Vepco's reconverting its oil-fired units to coal as a factor *in any of the present fuel adjustment proceedings,* limiting its ruling in this regard to a warning that it would do so effective 1 January 1981.

It is thus apparent that the sole basis for the Commission's finding in the present proceedings that Vepco's fuel expenses were too high and should be adjusted downward was its consid-

Utilities Comm. v. Power Co.

eration of the factors of poor heat rate and low plant availability, the factors which Vepco contends, and which we agree, were not properly before the Commission for consideration in proceedings brought under G.S. 62-134(e).

By enacting G.S. 62-134(e) in 1975, the General Assembly terminated effective 1 September 1975 the use of a fossil-fuel adjustment clause as a rider to an electric utility company's regular rate schedule[1] and replaced it with a statutorily prescribed procedure. Insofar as pertinent to the present proceedings, G.S. 62-134(e) provides:

*Change of rates; notice; suspension and investigation.*

(e) Notwithstanding the provisions of this Article, upon application by any public utility for permission and authority to increase its rates and charges based solely upon the increased cost of fuel used in the generation or production of electric power, the Commission shall suspend such proposed increase for a period not to exceed 90 days beyond the date of filing of such application to increase rates. Upon motion of the Commission or application of any person having an interest in said rate, the Commission shall set for hearing any request for decrease in rates or charges based solely upon a decrease in the cost of fuel. The Commission shall promptly investigate applications filed pursuant to provisions of this subsection and shall hold a public hearing within 30 days of the date of the filing of the application to consider such application, and shall base its order upon the record adduced at the hearing, such record to include all pertinent information available to the Commission at the time of hearing. The order responsive to an application shall be issued promptly by the Commission but in no event later than 90 days from the date of filing of such application. A proceeding under this subsection shall not be considered a general rate case . . .

---

[1]Our Supreme Court held in Utilities Comm. v. Edmisten, Attorney General, 291 N.C. 327, 230 S.E. 2d 651 (1976) that the Utilities Commission had acted within its statutory authority in permitting an electric utility to utilize a fossil fuel adjustment clause as an adjunct, or rider to its regular rate schedule.

**[1]** By the clear and express language of this statute, the legislature has provided a procedure by which a public utility may apply to the Utilities Commission for authority to increase its rates and charges *based solely upon the increased cost of fuel* used in the generation of electric power and by which the Commission, on its own motion or upon request of an interested rate payor, may consider and determine a decrease in rates or charges *based solely upon a decrease in the cost of fuel.* The procedure provided is an expedited one "and shall not be considered a general rate case."[2] Insofar as the Commission in the present cases considered and passed upon the cost of fuel used by Vepco in the generation of electric power during the periods in question by considering the reasonableness of the prices paid by Vepco for such fuel, it acted within the scope of the statutorily prescribed procedure. Insofar as the Commission considered and based its determination upon such factors as Vepco's heat rate and plant availability in these proceedings, it went beyond the scope of the procedure authorized by G.S. 62-134(e).

**[2]** "Heat rate" is the term used to describe the ratio between the amount of heat, expressed in Btu's, required to produce a killowatt-hour of electrical energy. "Plant availability," in the context of these proceedings, refers to the extent to which a particular electrical generating unit is available to produce electricity during a given period of time and is also expressed in terms of a ratio, called the "capacity factor," representing the relationship between actual generation of electricity from that unit during a given period of time to the theoretical maximum possible generation during the same period. Obviously, the low-

---

[2]This clear legislative declaration that a proceeding under G.S. 62-134(e) "shall not be considered a general rate case" controls to take such proceedings out from the general authority granted the Commission by G.S. 62-137 which provides:

§62-137. *Scope of rate case.* — In setting a hearing on rates upon its own motion, upon complaint, or upon application of a public utility, the Commission shall declare the scope of hearing by determining whether it is to be a general rate case, under G.S. 62-133, or whether it is to be a case confined to the reasonableness of a specific single rate, a small part of the rate structure, or some classification of users involving questions which do not require a determination of the entire rate structure and overall rate of return.

er the heat rate, the more efficient is the conversion of fuel into electricity, and the higher the capacity factor, the greater the availability of the plant to produce electrical power. Obviously, also, an electrical utility company which operates its system with a low heat rate and with a high capacity factor from its lower cost generating plants operates more efficiently than one which has a high heat rate and low capacity factor from such plants. In short, heat rate and capacity factor furnish convenient measuring devices by which to evaluate the overall efficiency with which a particular electrical utility system is operated.

Overall system efficiency ultimately depends upon management decisions made over a long period of time. These involve such questions as when and how often to replace expensive equipment, the number of maintenance employees to be kept on the payroll and the training to be given them, the amount and frequency of planned "down time" to be devoted to preventive maintenance, and the amount and cost of standby equipment required for such planned maintenance "down time." In making these decisions management must also take into account such factors as the cost of capital and the availability of funds required to implement them and must balance the need for achieving maximum plant efficiency against the financial costs of achieving that goal.

Review of such management decisions by the Utilities Commission *in a general rate case* is not only entirely appropriate but even necessary, for poorly maintained equipment justifies a subtraction from both the original cost and the reproduction cost of existing plant before weighing these factors in ascertaining the present "fair value" rate base of the utility's properties as required by G.S. 62-133, *see Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972), and serious inadequacy of a utility company's service, whether due to poor maintenance of its equipment or to other causes, is one of the facts which the Commission is required to take into account in determining what is a reasonable rate to be charged by the particular utility company for the service it proposes to render. *See Utilities Comm. v. Morgan, Attorney General*, 277 N.C. 255, 177 S.E. 2d 405 (1970).

We do not question that the efficiency with which a particular electrical utility company converts its fuel into electricity has a direct and significant bearing upon that company's fuel cost. Obviously it does. Nor do we question the necessity for the Utilities Commission to take into account the efficiency of the company's operations in fixing its rates in a general rate case as provided in G.S. 62-133. Obviously it should. We hold only that plant efficiency as it bears upon fuel cost is not a factor to be considered in the limited and expedited proceeding provided for by G.S. 62-134(e). After all, the legislature enacted that section, not as a substitute for a general rate case, but to provide an expedited procedure by which the extremely volatile and uncontrollable prices of fossil-fuels could be quickly taken into account in a utility's rates and charges. There is no such volatility in plant efficiency which depends upon long range maintenance decisions and practices carried out over a long period of time. We hold that the Commission erred in ordering rate reductions and ordering Vepco to make refunds based on changes made by the Commission in Vepco's fuel costs by taking into account the factors of heat rate and plant availability.

We also hold that the Commission erred in its order of 31 July 1979 by directing

> 4. That for billing periods after December 31, 1980, Vepco shall file fuel expenses showing an adjustment to reflect coal fired generation from Chesterfield Units 2 and 4, Portsmouth Units 3 and 4, and Possum Point Unit 4.

These were the generating units which the Commission found should be reconverted from oil to coal at least by 1 January 1981. It may well be that when 1981 comes, prudent management of Vepco's generating plant would call for reconverting the named units from oil-fired to coal. Whether that will be so can be better determined at that time. The Commission lacked statutory authority to make that determination seventeen months in advance.

Insofar as inconsistent with this opinion, the orders appealed from are reversed and the cases consolidated for hearing on this appeal are remanded to the Utilities Commission for further proceedings not inconsistent herewith.

Reversed and remanded.

Judges HEDRICK AND VAUGHN concur.