STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION, VIRGINIA ELECTRIC AND POWER COMPANY (APPLICANT), AND NORTH CAROLINA TEXTILE MANUFACTURERS ASSOCIATION, INC. v. THE PUBLIC STAFF-NORTH CAROLINA UTILITIES COMMISSION AND STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION, CAROLINA POWER & LIGHT COMPANY (APPLICANT), KUDZU ALLIANCE, AND NORTH CAROLINA TEXTILE MANUFACTURERS ASSOCIATION, INC. v. THE PUBLIC STAFF-NORTH CAROLINA UTILITIES COMMISSION

Nos. 8110UC812, 8110UC865

(Filed 3 August 1982)

Utilities Commission § 24— fuel adjustment proceedings—inability to consider cost of purchased power or interchange power

The Utilities Commission was and is without authority to include or consider the cost of any portion of purchased power or interchange power in determining a fuel adjustment clause proceeding pursuant to G.S. 62-134(e).

Judge MARTIN (Robert M.) dissenting.

APPEAL by the Public Staff of the North Carolina Utilities Commission from orders of the North Carolina Utilities Commission entered 27 February 1981. Heard in the Court of Appeals 1 April 1982.

On 26 January 1981, Carolina Power & Light Company (CP&L) filed an application with the North Carolina Utilities Commission pursuant to N.C.G.S. 62-134(e) and the Commission's Rule R1-36, requesting that the Commission issue an order approving an adjustment in basic rates by increasing the amount included for fuel expenses by $0.00196 cents per KWH effective for bills rendered on and after 1 April 1981. CP&L alleged that the requested adjustment was based solely on the change in cost of fuel for the four-month period ending December 1980.

On 29 January 1981, Virginia Electric and Power Company (Vepco) filed an application with the North Carolina Utilities Commission pursuant to N.C.G.S. 62-134(e) to adjust its rates and charges based solely upon the cost of fuel used in the generation of electric power for the four-month period ending 31 December 1980, by decreasing the amount included for fuel expenses in the base retail schedules by 0.402 cents per KWH for bills rendered on and after 1 April 1981.

These applications were heard by the Commission on 16 and 17 February 1981. In the CP&L application the Commission declined to remove the allowed fuel costs of purchased and interchange power from the fuel cost adjustment formula and ordered that "effective for bills rendered on and after April 1, 1981, and for service rendered on and after the effective date of this Order, CP&L shall adjust its base retail rates by the addition of an amount equal to $.00196 per kilowatt-hour and shall roll this amount into each kilowatt-hour block of each rate schedule."

In the Vepco application the Commission declined to remove the allowed fuel costs of purchased and interchange power from the fuel cost adjustment formula and ordered that "effective for bills rendered on and after April 1, 1981, and for service rendered on and after the date of this Order, Vepco shall adjust its base retail rates by the reduction of an amount equal to $0.00402 per kilowatt-hour and shall roll this amount into each kilowatt-hour block of each rate schedule."

State ex rel. Utilities Commission v. Public Staff

In each proceeding the Public Staff timely filed its notice of appeal and exceptions to the entry of the Commission's order.

*Robert F. Page, Chief Counsel, and Karen E. Long, for the Public Staff, North Carolina Utilities Commission, appellant.*

*Hunton & Williams, by Edgar M. Roach, Jr., for Virginia Electric and Power Company and Bode, Bode & Call, by John T. Bode, for Carolina Power & Light Company, appellees.*

MARTIN (Harry C.), Judge.

Whether purchased power or interchange power is properly to be considered in a fuel adjustment clause proceeding appears to be a question of first impression in North Carolina.

In the CP&L application, counsel for the Public Staff argued that as a matter of law CP&L should not be permitted to recover its purchase power expenses in this proceeding and that an increase in the base fuel cost of only 0.134 cents per KWH, including gross receipt taxes, should be approved. Counsel for CP&L argued that purchased power is a properly includable expense in a N.C.G.S. 62-134(e) proceeding and that the full base fuel cost adjustment it had applied for, 0.196 cents per KWH, should be approved. The same principles are argued in the Vepco proceeding.

The Public Staff contends that the Commission is no longer basing the approved fuel clause rate on charges based solely on the increased or decreased cost of fuel, but rather is basing the rate on the total power production costs expressed in cents per KWH. It is argued that under the present Commission practice, the fuel clause rate can increase due to changes in heat rate, plant availability and capacity factors, even though the cost of fuel has remained constant or even decreased.[1]

1. The Public Staff argues that under the current fuel clause procedure employed by the Commission, which tracks total power production costs (as opposed to solely increases in the cost of fuel), there is no incentive on the utilities to operate their plants in an efficient or proper manner. There is, it contends, no requirement of justness or reasonableness which is evident in the ratemaking provisions of the Public Utilities Act, N.C.G.S. 62-130 to -133. Instead, the test employed by the Commission is essentially as follows: Any dollars actually spent for fuel by the utility, regardless of how poorly or efficiently, may be tracked through the fuel

We review briefly the two major cases interpreting N.C.G.S. 62-134(e). In *Utilities Comm. v. Edmisten, Atty. General,* 291 N.C. 451, 232 S.E. 2d 184 (1977), the Court first construed the statute and discussed its impact upon the Commission's previous practices and procedures regarding fuel adjustment clauses. The Court held that the use of a historical test period to calculate fuel clause amounts is not to guarantee the utility an actual dollar-for-dollar recovery of prior expenses. To do so would be retroactive ratemaking. Instead, the use of prior actual operating experience in the context of a fuel clause proceeding is exactly like the ordinary use of a test period in a general rate case, i.e., recent actual operating experience is the best guide for what costs will be in the future period for which rates are to be set.

In *Utilities Comm. v. Power Co.,* 48 N.C. App. 453, 269 S.E. 2d 657, *disc. rev. denied,* 301 N.C. 531 (1980), this Court reviewed the action of the Commission in fuel adjustment proceedings such as those at issue here. The Commission had heard evidence as to a wide range of management activities which had allegedly affected generating plant efficiency. It found that "Vepco's fuel expenses are excessive and should be adjusted in these and future proceedings to remove unreasonable costs associated with poor system fossil-fired heat rate and low availability" of certain of its generating plants. *Id.* at 456, 269 S.E. 2d at 659. Based on findings of mismanagement, the Commission disallowed portions of the fuel adjustments requested.

These matters, in the Court's opinion, properly belonged in a general rate proceeding under N.C.G.S. 62-133 and not in an expedited N.C.G.S. 62-134(e) proceeding. This Court, through Judge Parker, held:

> Insofar as the Commission in the present cases considered and passed upon the cost of fuel used by Vepco in the generation of electric power during the periods in question by considering the reasonableness of the prices paid by Vepco for such fuel, it acted within the scope of the statutorily prescribed procedure. Insofar as the Commission considered

clause under N.C.G.S. 62-134(e). Thus, the fuel clause operates in virtually an automatic fashion and the role of the Public Staff and other intervenors is reduced to simply determining whether the dollars alleged to have been spent by the utilities for fuel were in fact spent.

and based its determination upon such factors as Vepco's heat rate and plant availability in these proceedings, it went beyond the scope of the procedure authorized by G.S. 62-134(e).

. . . .

Overall system efficiency ultimately depends upon management decisions made over a long period of time. These involve such questions as when and how often to replace expensive equipment, the number of maintenance employees to be kept on the payroll and the training to be given them, the amount and frequency of planned "down time" to be devoted to preventive maintenance, and the amount and cost of standby equipment required for such planned maintenance "down time." In making these decisions management must also take into account such factors as the cost of capital and the availability of funds required to implement them and must balance the need for achieving maximum plant efficiency against the financial costs of achieving that goal.

Review of such management decisions by the Utilities Commission *in a general rate case* is not only entirely appropriate but even necessary, for poorly maintained equipment justifies a subtraction from both the original cost and the reproduction cost of existing plant before weighing these factors in ascertaining the present "fair value" rate base of the utility's properties as required by G.S. 62-133 . . . and serious inadequacy of a utility company's service, whether due to poor maintenance of its equipment or to other causes, is one of the facts which the Commission is required to take into account in determining what is a reasonable rate to be charged by the particular utility company for the service it proposes to render. . . .

We do not question that the efficiency with which a particular electrical utility company converts its fuel into electricity has a direct and significant bearing upon that company's fuel cost. Obviously it does. Nor do we question the necessity for the Utilities Commission to take into account the efficiency of the company's operations in fixing its rates in a general rate case as provided in G.S. 62-133.

Obviously it should. We hold only that plant efficiency as it bears upon fuel cost is not a factor to be considered in the limited and expedited proceeding provided for by G.S. 62-134(e). After all, the legislature enacted that section, not as a substitute for a general rate case, but to provide an expedited procedure by which the extremely volatile and uncontrollable prices of fossil-fuels could be quickly taken into account in a utility's rates and charges.

48 N.C. App. at 460-62, 269 S.E. 2d at 661-62 (citations omitted).

A fuel adjustment clause, once authorized by the Commission as a part of the utility's rate structure, allows the utility to pass on to the consumer any increase (or decrease) in the cost of fuel without any need for further consideration of compensatory decreases (or increases) in other operating expenses. As such, it is a radical departure from the usual practice of approval or disapproval of filed rates, in the context of a general rate case.

As stated in *Power Co.*, the statute in clear and express terms provides a procedure by which a public utility may apply to the Commission for authority to increase its rate and charges based "solely upon the increased cost of fuel used in the generation of electric power." *Id.* at 460, 269 S.E. 2d at 661 (emphasis omitted); N.C. Gen. Stat. § 62-134(e) (Cum. Supp. 1981). The Commission has interpreted the statute to include as cost of fuel, the "cost of equivalent energy purchased." Being a plain and unambiguous statute, agency interpretation is not required. *Utilities Comm. v. Edmisten, Atty. General, supra.* By so interpreting the statute, the Commission has in effect amended the substantive law by adding an additional factor to be considered in determining fuel adjustment proceedings. This it cannot do. *Motsinger v. Perryman*, 218 N.C. 15, 9 S.E. 2d 511 (1940); *Carolinas-Virginias Assoc. v. Ingram, Comr. of Insurance*, 39 N.C. App. 688, 251 S.E. 2d 910, *disc. rev. denied*, 297 N.C. 299 (1979). Had the legislature intended that the cost of purchased power be recoverable in a fuel adjustment proceeding, it should and would have so stated.

Although the interpretation by an agency responsible for the administration of a legislative act may be helpful to a court when called upon to construe legislative language and will be given due consideration by the courts, it is not controlling. *Faizan v. Insurance Co.*, 254 N.C. 47, 118 S.E. 2d 303 (1961). The courts are

the final interpreters of legislation. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 28 L.Ed. 2d 136 (1971); *Campbell v. Currie, Commissioner of Revenue*, 251 N.C. 329, 111 S.E. 2d 319 (1959). The courts cannot discharge their duty to construe administrative statutes by the expedient of deferring to interpretations by the agency.

Even a casual reading of the statute discloses that proceedings thereunder are limited solely to increases and decreases in the cost of fuel. Fuel is entirely different from purchased or interchange power. Fuel is a necessary component required for the production of electric power. Electric power itself is the finished product of a utility, after fuel has been used in its production. If it were possible to extrapolate the cost of fuel from the cost of purchased or interchange power, the Commission would be required to rely upon the cost analysis and management decisions of the selling utility without the ability to test their accuracy and reasonableness. This is not a result intended by the legislature. Management decisions of petitioners (e.g., whether to use purchased power or the utilities' own stockpile of fuel), efficiency of operation, plant availability and like matters, have no place in the consideration of a fuel adjustment proceeding. *Utilities Comm. v. Power Co., supra*. These matters are proper for consideration in a general rate proceeding. *Id.* Consideration of purchased power in a fuel adjustment proceeding would inextricably involve questions of management, motivation, efficiency of plant operations, plant heat rate and plant availability. This Court has ruled that these considerations are not permitted in a fuel adjustment proceeding. *Id.*

N.C.G.S. 62-134(e) was properly adopted in 1975 by the General Assembly to allow then hard pressed utilities to compensate for rapidly increasing fuel prices. It was never intended to allow utilities to pass on to consumers the cost of power purchased from other utilities. The Commission states that it has allowed utilities to pass on to the consuming public the cost of purchased power in "nearly forty individual proceedings" under the cost of fuel adjustment statute—all apparently without express court approval regarding this issue. It is time for the Court to place its interpretation upon the statute. A question of law is never settled until it is settled correctly.

We now hold that the Commission was and is without authority to include or consider the cost of any portion of purchased power or interchange power in determining a fuel adjustment clause proceeding pursuant to N.C.G.S. 62-134(e). By doing so in these proceedings, the Commission committed error.

The orders of the Commission are vacated and the causes are remanded to the Commission for further proceedings not inconsistent with this opinion.

Vacated and remanded.

Judge WHICHARD concurs.

Judge MARTIN (Robert M.) dissents.

Judge MARTIN (Robert M.) dissenting.

I respectfully dissent from the majority opinion. In my opinion the holding by the majority that the Commission was and is without authority to include or consider the cost of any portion of purchased power or interchange power in determining a fuel adjustment clause proceeding pursuant to G.S. 62-134(e) is clearly erroneous.

In purchase and interchange power transactions there are two components of price paid by the purchasing utility for such purchased and interchange power. One component is the capacity cost, which reflects generating plant, transmission and distribution costs and other fixed costs of the selling utility. This component is not included by the Commission in setting rates pursuant to G.S. 62-134(e).[1] The other component is the energy cost, which is the cost of fuel utilized to generate the electricity produced. This component is required by the Commission's Rule R1-36 to be included in establishing rates pursuant to G.S. 62-134(e).

The Commission has no authority except that given to it by statute. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E.

---

1. Capacity factor is simply a means of measuring plant operating efficiency. In *Utilities Comm. v. Power Co.*, 48 N.C. App. 453, 269 S.E. 2d 657, *disc. rev. denied*, 301 N.C. 531, 273 S.E. 2d 462 (1980), this Court held that ". . . plant efficiency as it bears upon fuel cost is not a factor to be considered in the limited and expedited proceeding provided for by G.S. 62-134(e)." *Id.* at 462, 269 S.E. 2d at 662.

2d 705 (1972). The legislative mandate under G.S. 62-134(e) provides "[n]otwithstanding the provisions of this Article, upon application by any public utility for permission and authority to increase its rates and charges based solely upon the increased cost of fuel used in the generation or production of electric power, the Commission shall . . ." and the declaration that a proceeding under the subsection "shall not be considered a general rate case" is clear and unambiguous. It therefore must be given effect and its clear meaning may not be evaded by an administrative body or a court under the guise of construction. *Peele v. Finch*, 284 N.C. 375, 200 S.E. 2d 635 (1973); *Utilities Comm. v. Electric Membership Corp.*, 275 N.C. 250, 166 S.E. 2d 663 (1969).

Neither the language of G.S. 62-134(e) nor this Court's opinion in the Vepco Case limit recoverable fuel costs under the fuel adjustment clause or statute to the utility that generates electricity. When a generating utility sells electricity to another utility, as here, the purchasing utility must bear the energy component as part of the purchase price. Normally under the fuel adjustment clause, these costs would be passed directly to serviced customers as an expense of the utility which generates the electricity.

In *Consumers' Counsel v. Public Utilities Commission*, 56 Ohio St. 2d 319, 384 N.E. 2d 245 (1978), the Office of Consumer Counsel argued that it was not within the Commission's rule making authority to permit the pass-through of purchased power which is neither an acquisition nor a delivery cost. The Ohio Edison company generated electricity on its own system. On occasion, however, for reasons of necessity or economy, the company purchased electricity generated by other utilities. The company's practice was to pass costs related to the purchased electricity to serviced customers through a fuel cost adjustment clause. The company charged its customers for the acquisition and delivery costs of fuel incurred by the generating, or selling, utility. These costs were reflected in a portion of the purchase price paid by the company for the electricity. The court rejected the O.C.C.'s position, stating that costs of fuel do not cease to exist on sales of power, but are incorporated in the price paid for electricity. The ultimate consumer, receiving the benefit of power purchases, is in effect charged for the acquisition and delivery costs of the

generating company.[2] Thus, the court permitted the inclusion of these costs in the FAC of the purchasing utility, which through a chain of transactions was actually absorbing these costs.

Appellant argues essentially that the words "purchased power" do not appear in these definitions. While this is true, it is not dispositive of the issue. R.C. 4905.01 does not limit recoverable fuel costs under a fuel cost adjustment clause to the utility that generates electricity. Its scope is far broader. The statute merely states that the cost of acquiring title to, and delivery of, fuel is recoverable under a fuel cost adjustment clause. Normally these costs would be passed directly to serviced customers as an expense of the utility which generates the electricity. However, when a generating utility sells electricity to another utility, as here, the purchasing utility must bear the acquisition and delivery costs as part of the purchase price. These costs have not ceased to exist upon sale; they have merely been incorporated in the price paid for the electricity. Customers of the purchasing utility who receive the benefit of these fuel expenditures are, in fact, charged for the acquisition and delivery costs of the generating utility, via the purchasing utility, which the statute permits.

*Consumers' Counsel v. Public Utilities Commission*, 56 Ohio St. 2d 319, 321-22, 384 N.E. 2d 245, 247 (1978).

Throughout its order, the Commission has repeatedly stated that the capacity portion of purchased and interchange power fuel cost are not permitted to be recovered in the Commission's fuel

---

2. Delivery and acquisition costs are defined in R.C. 4905.01(E) and (F), respectively:

(E) "Delivery cost" means the cost of delivery of fuel, to be used for the generation of electricity, from the site of production directly to the site of an electric generating facility.

(F) "Acquisition cost" means the cost to an electric light company of acquiring the title of fuel to be used for the generation of electricity. * * * Such term does not embrace any associated cost including, but not limited to, delivery cost, the cost of handling the fuel after its delivery to such facility, the cost of such processing, readying, or refinement of the fuel as may be necessary in order to use the fuel to generate electricity or the cost of disposing of any residue of such fuel after it has been so used.

cost adjustment formula. In its order the Commission found as a fact and concluded:

The capacity costs of purchased and interchange power were and are not included in said formula. The fuel cost adjustment formula was adopted to enable the Commission and Staff to review more effectively the fuel cost filings made in accordance with G.S. 62-134(e) in the expedited proceedings provided for by that statute.

The inclusion of the allowed fuel costs of purchased power and interchange power has not been modified or altered since the adoption of the formula in 1976. In nearly forty individual proceedings and two generic proceedings concerning the formula and the recovery of fuel costs, this Commission has consistently allowed the recovery of CP&L's allowed fuel costs for purchased power and interchange power. As acknowledged in our Order dated May 18, 1978, in Docket No. E-2, Sub 316, the Public Staff has also heretofore recognized that "(p)roperly monitored, the formula accurately tracks changes in the cost of all fuel, nuclear as well as fossil, and the energy portion of purchased and interchange power."

A review of our application of the language and procedures of G.S. 62-134(e) clearly indicates our uniform and undisturbed interpretation that the cost of a utility's fuel to be recovered in a fuel proceeding includes allowed fuel costs for purchased and interchange power which are described in the fuel cost adjustment formula. The formula's computation includes only the costs of fuel used to generate or produce power or the cost of equivalent energy purchased. For example, the cost of a ton of coal burned by Duke Power Company included in the price of power purchased by CP&L is just as much a cost of fuel to CP&L as if CP&L had actually burned the coal itself. Consequently, the cost of fuel burned by a selling utility should be considered a component of the fuel cost of the purchasing utility which may be recovered in a proceeding pursuant to G.S. 62-134(e) . . . . Any other conclusion is simply at odds with the language of G.S. 62-134(e) and our consistent construction of such language.

The Public Staff has urged the Commission to abandon that consistent construction of the provisions of G.S. 62-134(e)

based on the Public Staff's interpretation of the recent deci-
sion of the Court of Appeals of North Carolina in *Virginia
Electric and Power Company*, 48 N.C. App. 452, supra
(Vepco). While the Public Staff acknowledges that our
previously adopted treatment of the costs of purchased and
interchange power in fuel cost adjustment proceedings was
the appropriate application of G.S. 62-134(e), the Public Staff
now argues that as a consequence of the Vepco decision, the
consideration of such costs must be reserved for a general
rate making proceeding pursuant to G.S. 62-133.

It is a fundamental rule of statutory interpretation that the
construction placed upon a statute by the regulatory body re-
quired by law to administer the statute is entitled to great
weight. *Gill v. Board of Commissioners*, 160 N.C. 176, 76 S.E. 203
(1912). *See also State ex rel. Utilities Commission v. McKinnon*,
254 N.C. 1, 118 S.E. 2d 134 (1961).

The Commission found and concluded that:

In addition to North Carolina, twenty-two of the other
twenty-four states east of the Mississippi River permit pur-
chased power to be included in their fuel clauses. The
Federal Energy Regulatory Commission (FERC) also includes
purchased power in wholesale fuel clauses. The Public Utility
Regulatory Policies Act (PURPA) of 1978, requires states
with automatic fuel adjustment clauses "to provide incentives
for efficient use of resources (including incentives for
economical *purchase* and use of fuel and electric energy) . . ."
and authorizes the FERC to exempt electric utilities from
any provision of state law, or from any state rule or regula-
tion, which prohibits or prevents the voluntary coordination
of electric utilities if the FERC determines that such volun-
tary coordination is designed to obtain economical utilization
of facilities and resources.

The energy portion of purchased and interchange power
fuel costs has been allowed to be included in fuel clause pro-
ceedings for Carolina Power & Light Company since 1976;
the capacity portion of such costs are not permitted to be
recovered in the Commission's fuel cost adjustment formula.
In 1980, the purchased power and interchange transactions of
Carolina Power & Light Company reduced its power produc-

tion costs by approximately $4.5 million on a total company basis. In the four-month period ending December 31, 1980, such transactions reduced CP&L's total company power production costs by approximately $1 million. Substantially all of the power purchased in the four-month test period by CP&L was economy power which is inherently cheaper than power generated at that point in time from CP&L's own generating plants.

\* \* \*

Adoption of the adjustment proposed herein by the Public Staff would lead to the result that for the test period, Vepco would be denied the right to recover in its base fuel cost rates the amount which the Company expended for allowed fuel costs of purchased and interchange power in an effort to reduce system fuel costs and thereby benefit the using and consuming public. In this regard, Vepco witness Keesecker testified that, on a total company basis, Vepco expended approximately $68 million for purchased and interchange power during the four-month period ending December 31, 1980, and that if Vepco had itself generated the same level of power which it purchased during said period by use of its own oil-fired generating units, the Company's fuel costs would have been increased by approximately $54 million. Vepco had every right and expectation that it would recover such fuel-related costs since the Commission has permitted those types of recoveries since late 1975 pursuant to the fuel cost adjustment formula adopted in general rate cases and generic hearings.

The Commission further found and concluded that: "It is the declared policy of the State of North Carolina to encourage the coordination of the operation of utility systems to increase the economy and reliability of utility service."

Thus, inclusion of purchased power in the fuel adjustment clause is often considered an incentive to use low-cost sources of power. Purchased power is a substitute for that power which a utility ordinarily would generate itself. The ability to buy power from another utility at a price less than the cost of self-generation is clearly desirable from the standpoint of economic efficiency and there is little question that it is beneficial to the ultimate con-

sumer. Purchased power transactions involve millions of dollars in split-second decisions of utility dispatchers. Although administrative review of purchased power transactions has to be extremely difficult, this fact did not present an issue in these proceedings. Public Staff witness Sullivan verified the fact that the calculations submitted by CP&L and Vepco were mathematically accurate and that, had the Public Staff included the allowed fuel cost of purchased power and interchange power, its computation of the base fuel cost component would have been identical to that filed by CP&L and Vepco.

G.S. 62-2 declares the public policy of the State of North Carolina to be, in pertinent part, to "provide fair regulation of public utilities in the interest of the public," to "promote adequate, reliable and economical utility service," to "provide just and reasonable rates . . . consistent with long-term management and conservation of energy resources by avoiding wasteful, uneconomic and inefficient uses of energy," to "foster the continued service of public utilities on a well-planned and coordinated basis that is consistent with the level of energy needed," and to promote and coordinate "interstate and intrastate public utility service and reliability of public utility energy supply." Thus, it is consistent with these policies for utilities to supply power to each other from available capacity in order to increase the reliability and economy of the operations of each other and to improve the quality and economy of the services provided to their consumers. It is my opinion that G.S. 62-134(e) did not prevent the purchasing utility, who absorbed the fuel component cost of the generating utility, from having such energy expenditures included in its fuel based rates. The Commission met the statutory mandate by requiring all fuel costs, including the fuel cost portion of purchased and interchanged power, to be included in fuel based rates and its order should be affirmed.

House Bill 1594, amending Chapter 62 of the General Statutes, ratified 17th June 1982, repealed G.S. 62-134(e). It has no application to this case, it having been enacted subsequent to the order of the Commission to which this appeal relates. I note, however, that the new legislation provides that the Commission may allow the utility to charge as a rider to their rates the cost of fuel and the fuel component of purchased power used in providing their North Carolina customers with electricity from the

cost of fuel and the fuel component of purchased power established in their previous general rate case.