STATE OF NORTH CAROLINA, ex rel. UTILITIES COMMISSION AND CAROLINA WATER SERVICE, INC. OF NORTH CAROLINA, Applicant for Authority to Increase Rates for Water and Sewer Utility Service in Bent Creek, Mt. Carmel Subdivisions, Buncombe County, North Carolina v. INTERVENOR RESIDENTS OF BENT CREEK/MT. CARMEL SUBDIVISIONS

No. 8010UC827

STATE OF NORTH CAROLINA, ex rel. UTILITIES COMMISSION AND CAROLINA WATER SERVICE, INC. OF NORTH CAROLINA, Applicant of Approval of Service Contracts v. INTERVENOR RESIDENTS OF BENT CREEK/MT. CARMEL SUBDIVISIONS

No. 8010UC1060

(Filed 2 June 1981)

**1. Utilities Commission § 38— public utility rates—charges by affiliated companies—contracts not filed with Commission**

G.S. 62-153 does not prohibit the Utilities Commission from considering charges to a public utility for services rendered by affiliated corporations pursuant to contracts not filed with and approved by the Utilities Commission as expenses of the utility for purposes of ratemaking so long as the Commission determines in the ratemaking procedure that the agreements between the utility and affiliated corporations are just and reasonable and it does not appear that their purpose is to conceal or divert profits from the utility to an affiliate.

**2. Utilities Commission § 38 — public utility rates—charges by affiliated companies—determination of reasonableness**

The Utilities Commission must determine the reasonableness of charges to a public utility by an affiliated corporation on the basis of either (1) the cost of the same services on the open market; (2) the cost similar utilities pay to their service companies; or (3) the reasonableness of the expenses incurred by the affiliated corporation in generating its services. Therefore, an order by the Utilities Commission granting a rate increase to a water and sewer utility was based in part on expenses which were unsupported by competent, material or substantial evidence as to their reasonableness where the utility presented evidence of the method by which the expenses of affiliated service companies were allocated to the utility but no evidence that the expenses thus allocated represented reasonable expenses for the goods and services so provided.

**3. Utilities Commission § 38— public utility rates—necessity for examining books of affiliated companies**

An examination by the Utilities Commission of the books and records of companies affiliated with a regulated utility is necessary in a rate case only if

there is no evidence of what the utility would have had to pay non-affiliated companies for the same services or of what similar utilities pay their service companies for similar services.

**4. Utilities Commission § 38— public utilities—service contract with affiliated company—approval by Utilities Commission**

The Utilities Commission properly approved a service contract between a water and sewer facility and an affiliated corporation where the evidence indicated that the utility was receiving services from the affiliated corporation at the corporation's cost.

APPEALS by intervenor residents from the North Carolina Utilities Commission. Order granting rate increase entered 17 April 1980 (No. 8010UC827). Order approving utilities' contracts with service corporation entered 30 July 1980 (No. 8010UC1060). Cases consolidated for appeal and heard in the Court of Appeals 11 March 1981.

Appellee, Carolina Water Service, Inc. of North Carolina, [hereafter "the Company"], is a North Carolina water and sewer operating company which at the time pertinent to this case operated water facilities in the Pine Knoll Shores Subdivision of Carteret County, and water and sewer facilities in the Bent Creek and Mt. Carmel Acres Subdivisions of Buncombe County. The Company is a wholly-owned subsidiary of Utilities, Inc., a holding company, located in Northbrook, Illinois. Utilities, Inc. also owns approximately 30 other operating water and sewer companies in nine states. Sister or affiliated companies pertinent to the understanding of this case include Carolina Water Service, Inc., [hereinafter CWS] a subsidiary with utility operations in the State of South Carolina, Sugar Mountain Utility, Inc., which operates a subdivision in Avery County, North Carolina, and Water Service Corporation, [hereafter WSC] located in Northbrook, Illinois, which serves as the service corporation for all of the operating subsidiaries of Utilities, Inc. The Company serves approximately 470 households in the Mt. Carmel/Bent Creek area. The Company employs two operating personnel who work in the Bent Creek/Mt. Carmel area maintaining the water and sewer system and providing customer assistance. A full-time secretary employed by Sugar Mountain Utility, Inc., in Sugar Mountain handles service complaints from the customers in the Bent Creek/Mt. Carmel Acres area which she receives by telephone from the customers who reach her via a toll-free number. The offices of the Company in the Bent Creek/Mt. Carmel Acres area

consist of a mobile home which has been adapted for use as a record keeping and basic water testing facility space. Some operating, engineering, and administrative services are rendered to customers of the Bent Creek/Mt. Carmel Acres Subdivision from CWS headquartered in Columbia, South Carolina. The remainder of the management, administrative, engineering, legal, and personnel assistance are rendered through WSC headquartered in Northbrook, Illinois.

Case No. 8010UC827 is an appeal from an order of the Commission granting a rate increase. On 2 July 1979, the Company filed an application for authority to increase its rates for water and sewer service for only the Bent Creek and Mt. Carmel Acres Subdivisions in Buncombe County. The Company proposed an annual increase in gross revenues of $34,370 based upon a test year ending 31 December 1978. The Company's income statement for the year ended 31 December 1978, filed as a part of its application, indicated an actual net operating loss of $31,652 which, after *pro forma* adjustments, decreased to a loss of $7,851. Under the requested increase of $34,370 the *pro forma* net operating income would have become $14,843, providing a rate of return on original cost net investment of approximately 7.66%.

Prior to the hearing of the case which began on 6 November 1979, the Public Staff of the North Carolina Utilities Commission and Appellant/Intervenors, Residents of Bent Creek and Mt. Carmel Acres Subdivisions, filed notice of intervention. Also, accounting and engineering members of the Public Staff conducted audits and investigations into the Company's application, its service area, and its books of account.

During the course of the hearing on this matter, Patrick J. O'Brien, Corporate Treasurer of the Company, testified in support of the application and sponsored the exhibits and schedules which supported the relief requested. Mr. O'Brien testified that the rates under consideration were approved by the Commission on 15 November 1978, but resulted in approximately a $36,000 loss for the company during the test year. Mr. O'Brien testified that those rates were confiscatory in that they were insufficient to allow the company to pay the interest on all of its debt much less provide a rate of return on the equity to the investors. Mr. O'Brien testified to the allocation of operating and maintenance expenses which were allocated to the Company from WSC and

CWS. The total allocated expense from WSC to the Bent Creek and Mt. Carmel Acres Subdivisions was $19,471.

Mr. O'Brien testified that due to the negative rate of return experienced during the test year, the Company made insufficient money to pay back all of the allocated expenses. Even though the service corporation was not paid for all its services rendered, the service company did not cut back on the amount of services provided. During the test year the operating loss prevented the Company from paying interest on its long-term debt capital. The operating expenses allocated from affiliated companies enabled the Company to provide service more cheaply than had the Company operated independently. The allocation procedures were discussed and O'Brien stated that they were reasonable. O'Brien stated that in his opinion a fair rate of return for the Company was approximately 15%. Nevertheless, the Company had sought a much more modest rate of return in order to approach a reasonable rate of return gradually.

Millard B. Shriver, Vice President of CWS, testified as to his duties and functions as far as they related to services rendered to the Company.

Jesse Kent, Accountant for the Public Staff, testified that he had audited the Company's books and analyzed data submitted by the Company. He submitted his findings and, with minor adjustments, accepted the Company's figures.

The Hearing Examiner issued a recommended order on 19 February 1980, and held that while the 7.66% rate of return requested would have been appropriate had the Company provided adequate service, the Company should be penalized 2.02% for inadequate service and should therefore receive only a 5.64% rate of return or an increase of $25,784 in annual revenues.

The Intervenor Residents filed Exceptions to said Recommended Order and orally argued the issues before the North Carolina Utilities Commission. The North Carolina Utilities Commission entered a Final Order Overruling the Exceptions and Affirming the Recommended Order.

\*    \*    \*

In the course of the hearings on the rate increase, it was discovered that the Company had failed to secure Commission ap-

proval of its service contracts with WSC as required by G.S. 62-153. On 21 January 1980, therefore, the Company filed a petition with the North Carolina Utilities Commission for approval of service contracts between the Company and WSC. In addition, the Company sought approval of the practice whereby services are provided to the Company by CWS. On 18 February 1980, the Intervenors, customers of the Company in the Bent Creek, Lee's Ridge, and Mt. Carmel Acres Subdivisions moved that the contracts as tendered be disapproved and sought permission to intervene in the dockets. On 12 March 1980, the Public Staff of the North Carolina Utilities Commission filed a Notice of Intervention. On 4 March 1980, the Commission, noting that Intervenors had requested a hearing, determined that a hearing should be scheduled in these dockets with respect to the justness and reasonableness of the proposed service contracts and scheduled the matter for hearing. When the hearing took place on 13 March 1980, Intervenors failed to appear.

Patrick J. O'Brien, Corporate Treasurer of the Company, Utilities, Inc., and WSC, testified in support of the Petition. Mr. O'Brien testified that the sole function of Water Service Corporation is to provide management services, operating expertise, and financing for the operating utilities. All of the employees providing service to the Company and other operating facilities of Utilities, Inc., are employees of WSC. Services provided to the operating companies by WSC include executive, maintenance, testing, financial, operating, legal, engineering, organization, and regulatory advice. Additional services include the provision of accounting expertise in the areas of bookkeeping, payroll, tax determination, financial statement preparation, budgets, availability of finance and credit, filing of annual reports, and preparation of rate cases. Mr. O'Brien testified that there are economies of scale available to the Company by service from WSC in that a large number of operating systems are managed through a central management operation with a readily available professional staff with access to facilities such as a computerized billing and accounting system. Mr. O'Brien testified that absent the affiliation with the parent company the Company would have to obtain these services on an independent and more costly basis or do without the services entirely. Mr. O'Brien testified that as a result of the affiliation the ratepayers of the Company receive a

higher degree of service at a lower rate than would otherwise be obtainable.

The costs of service from WSC are recovered from the operating affiliates such as the Company through several methods of assignment or allocation. Operating companies are charged directly for costs incurred exclusively for the company in question. Other costs are allocated on a customer equivalent basis where each customer is treated as one, and costs are allocated to operating affiliates in accordance with the ratio of each company's customers to the total number of customers served by WSC. Another method of allocation is called the adjusted customer equivalent basis. Under this method adjustments are made, among other reasons, because the offices of WSC serve as the headquarters for operating companies in Illinois and Indiana, and costs allocated to companies in other states are reduced for that reason. Finally, costs are allocated on the payroll basis. Charges such as employee benefits, insurance, and payroll taxes are allocated to operating companies on the basis of payroll as opposed to the number of customers. Mr. O'Brien testified that the method WSC uses to allocate its costs incorporates an effort to distribute fairly and equitably the expenses to the appropriate operating companies in a simple and manageable fashion. These services are provided at cost and without profit.

Other services are provided to the Company by other affiliated corporations. For example, Mr. Millard Shriver, overall operating manager of CWS, provides services to the Company. A billing clerk in Sugar Mountain provides services for customers of the Company, in the Asheville area.

Although the fees from the service corporation have always been charged to the Company, the expenses have not always been collected as a result of poor cash flow of the operating companies. However, the service corporation has continued to provide service even when its expenses were not being recovered. The expenses that have been charged to the Company have been scrutinized by the Commission in several general rate proceedings. In all cases, all expenses have been allowed as deducations from revenue for ratemaking purposes.

No evidence was offered in opposition to the Petition. By Recommended Order dated 15 May 1980, the Hearing Examiner

approved the Service Contracts and noted with approval the practice whereby sister or affiliated companies provide service to the Company. Intervenors appealed the Recommended Order to the Full Commission. The Commission overruled the Intervenor Residents' exceptions and upheld the Hearing Examiner's Recommended Order. The appeal of this order constitutes case No. 8010UC1060.

*Orr, Payne & Kelley by Robert F. Orr for intervenor residents.*

*Hunton & Williams by Edward S. Finley, Jr., for applicant appellees, Carolina Water Service, Inc. of North Carolina.*

CLARK, Judge.

These two appeals concern the same utility and the same intervenors. It appears from the record that the contract approval case arose out of the rate case. The parties agreed to consolidate the cases for hearing. We elect, therefore, to file one opinion settling both appeals. Although the issues are related, for the sake of clarity, we will treat the appeals separately, beginning with the rate case.

[1]  Intervenors' first argument is that the Utilities Commission should not have considered the expenses allocated from CWS and WSC in establishing new rates because they reflected charges for services rendered by affiliated corporations pursuant to contracts not filed with an approved by the Commission as required by G.S. 62-153. Intervenors' position is that failure to file the contracts and seek Commission approval should result in the disallowance of expenses incurred thereunder. We cannot agree.

The statute requiring filing and approval was clearly enacted for the purpose of discovering contracts between affiliated corporations which were "unjust or unreasonable, and made for the purpose or with the effect of concealing, transferring or dissipating the earnings of the public utility." G.S. 62-153(a). Contracts found to be so are to be avoided and we think expenses incurred under such contracts would have to be disregarded in computing a utility's expenses. The consideration of the Commission under G.S. 62-153(a) is whether the contracts are just and reasonable. If they are, and are not efforts to divert or conceal

profits, they are to be approved. The statutory scheme is directed at *prior* approval.

The testimony at the hearing indicates that the agreements with WSC and CWS were that the affiliates would provide services to the company at costs. The Commission, had it examined the contracts prior to their implementation, could have looked only to the prospective effect of such agreements; the reasonableness and justness of the *scheme* set up thereby, *i.e.*, whether it was just and reasonable to allocate the affiliates' expenses to the company and whether the scheme of allocation was just and reasonable under the circumstances. There was competent, material, and substantial evidence to the effect that the affiliates allocated to the company only their expenses, and there was extensive evidence on the various methods of allocation from which the Commission could conclude that the allocation methods were just and reasonable.

Intervenors' real argument in this appeal is with the reasonableness of the expenses incurred by the affiliates; however, the Commission is not charged under G.S. 62-153 with examining the reasonableness of actual expenditures. It could not, under normal conditions, because the contracts would be executory and the affiliate would not yet have incurred any expenses or provided any services to the utility.

G.S. 62-153(b) prohibits payments to affiliates under contracts not approved by the Commission. The record suggests that because of the poor financial condition of the Company, few payments had been made to the affiliates. Regardless, however, of whether the expenses had been paid, we see no reason to disregard their character as expenses once the Commission found the contracts under which the expenses accrued to be just and reasonable. We hold that G.S. 62-153 does not prohibit the Utilities Commission from considering fees owed to affiliated corporations under unfiled contracts as expenses of the public utility for purposes of ratemaking so long as the Commission does determine in the ratemaking procedure that the agreements between the utility and the affiliated corporations are just and reasonable and it does not appear that their purpose is to conceal or divert profits from the public utility to an affiliate.

Intervenors' second argument is that the order granting the rate increase was based in part on expenses which were unsup-

ported by competent, material, or substantial evidence as to the reasonableness of the expenses. Specifically, intervenors claim that the allocated expenses of WSC and CWS could not properly be included in the Company's operating expenses absent evidence that the affiliates incurred the expenses in a reasonable manner. While the Commission appears to have considered the reasonableness of the method of allocation, it appears to have accepted without question the operating expenses claimed by WSC and CWS.

The Utilities Commission has authority to "make, fix, establish or allow" only those rates which are "just and reasonable." G.S. 62-130. *See also,* G.S. 62-131. G.S. 62-133.1(a) provides: "In fixing rates for any water or sewer utility, the Commission may fix such rates on the ratio of the operating expenses to the operating revenues . . . ." G.S. 62-133(b) (3) establishes that the operating expenses to be used by the Commission are "reasonable operating expenses." This logically follows from the requirement of G.S. 62-133.1(a). For rates to be reasonable, the figures from which they are derived must be reasonable. To uphold its statutory duty to establish reasonable rates then, the Commission must examine each of the components going to make up a utility's expenses for reasonableness.

Two of the components going to make up the total operating expenses of the company in this case were the $19,471.00 share of the operating expenses of WSC which was allocated to the Company and the $8,190 share similarly allocated from CWS to the Company and counted as part of the Company's operating expenses. While there was evidence of record that WSC and CWS actually incurred these expenses and that the amount allocated to the Company was a fair proportion of the whole, there appears in the record no evidence whatsoever that the expenses incurred by WSC and CWS in providing these services were just and reasonable. Our Supreme Court has quoted with approval the following language of the Pennsylvania Supreme Court:

" 'Charges arising out of intercompany relationships between affiliated companies should be scrutinized with care [citations omitted] and if there is an absence of data and information from which the reasonableness and propriety of the services rendered and *the reasonable cost of rendering*

*such services by the servicing companies* can be ascertained by the commission, allowance is properly refused. * * *

'Moreover, the record in this case is an illustration of the fact that effective and satisfactory State regulation of utilities is made increasingly difficult by the progressive integration of utility services under holding company domination.

'The desire of public utility management, evidenced by various methods, to secure the highest possible return to the ultimate owners is incompatible with the semi-public nature of the utility business, which the management directs. It therefore follows that the commission should scrutinize carefully charges by affiliates, as *inflated charges to operating companies may be a means to improperly increase the allowable revenue and raise the cost to the consumers of utility service as well as an unwarranted source of profit to the ultimate holding company.*' "

*Utilities Comm. v. Telephone Co.,* 281 N.C. 318, 346, 189 S.E. 2d 705, 723 (1972). (Emphasis added.)

The evidence that WSC and CWS charged the Company with a fair proportion of their costs does not establish that those costs were reasonably incurred. There are any number of ways that an unregulated affiliated corporation's expenses for goods and services could be passed directly on to a regulated utility in such a manner as to result in the diversion of profits away from the regulated utility to an affiliate. For example, the failure of the Commission to look behind the expense figure listed by affiliated corporations would allow a service corporation to purchase goods, materials, or services from a third affiliate at an unreasonably inflated price and then pass that unreasonable price on to the regulated utility as costs. The service company would lose nothing since its costs would be reimbursed. The third affiliate would reap huge profits which presumably would be passed along to a parent holding company. The regulated utility would then show an artificially inflated loss justifying an artificially inflated rate to be borne by in-state consumers. Such a scheme is entirely possible if the Utilities Commission is allowed to base its conclusion of justness and reasonableness on the simple, superficial fact that an affiliated corporation sold goods and services to a regulated utility at its "cost."

[2]   The burden was on the utility to show that the price it paid to affiliate corporations was reasonable. *Id.* The utility presented extensive evidence of the method by which the expenses of its affiliates were allocated as expenses of the regulated utility, but no evidence at all that the figure thus allocated represented a reasonable expense for the goods and services so provided. We hold that the Utilities Commission's finding that "charges paid to the service corporation are reasonable" was an error. The utility presented no evidence of what the services would cost the utility on the open market, but only presented the self-serving statements of an officer (Treasurer of the Company, of WSC, of CWS and the parent holding Company) to the effect that services were provided to the Company at cost and that they woiuld have cost the company more if provided in any other manner. This was not enough. We believe that in the case of affiliated corporations the Utilities Commission is obligated to determine the reasonableness of the charges on the basis of either (1) the cost of the same services on the open market; (2) ⁺he cost similar utilities pay to their service companies, *see Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 685-86, 208 S.E. 2d 681, 690 (1974); or (3) the reasonableness of the expenses incurred by the affiliated corporation in generating its services. This third method of establishing the reasonableness of a service company's charges is made possible by the provisions of G.S. 62-51 which specifically authorize the Commission to inspect the books and records of corporations affiliated with a regulated utility. The record does not indicate any inquiry by the Commission into what would constitute a reasonable price for the services the Company received, nor does the record reveal any inquiry into whether the expenses incurred by WSC and CWS were in fact reasonable. In light of this failure we conclude that the Commission's order granting the requested rate increase was based in part on expenses which were unsupported by competent, material, or substantial evidence as to their reasonableness.

[3]   Intervenors' third argument is that the Commission erred in failing to examine the financial data of the Company's parent and affiliated companies. We believe that examination of the records of affiliated companies under G.S. 62-51 would be necessary in this case only if there were no evidence of what the company would have had to pay non-affiliated companies for the same serv-

ices, or in the alternative, of what similar utilities pay their service companies for similar services. If no evidence is offered on either of these issues, the only remaining evidence upon which the Commission could properly base a conclusion that the Company was reasonable in paying the allocated amounts to WSC and CWS would have to come from an examination of the books of WSC and CWS to determine if their expenses in generating the services were reasonable. If upon hearing on remand the Commission hears evidence which would support a finding of reasonableness of the expenses paid to WSC and CWS without resorting to an examination of each company's records, then that alone will suffice. If, however, no evidence is presented of the fair value of the services on the open market, or of expenses in similar operating company-service company relationships, then the Commission will be faced with a choice between examining the records and denying the rate increase.

*    *    *

[4] In a separate but related appeal, No. 8010UC1060, intervenors assign error to the Commission's 30 July 1980 Order approving the service contracts of the Company and Sugar Mountain Utility Company (Utilities, Inc.'s other North Carolina subsidiary) with Water Service Corporation. They argue that the contracts were improperly approved because there was a lack of competent, material, and substantial evidence as to their reasonableness and justness. The evidence before the Commission indicated that the Company and Sugar Mountain were receiving the services of WSC at its cost. It would appear that the price of services provided to an affiliated operating company at "the cost (not including profit) thereof" must be just and reasonable.

Intervenors argue that there was no evidence of the reasonableness of the costs incurred by WSC in providing the services. We agree, but as we have previously pointed out, the purpose of G.S. 62-153 is merely to assure that executory contracts between affiliates be just and reasonable on their face. There is nothing unjust about passing on to the Company the costs of services it receives. Approval of the contracts is therefore proper. The possibility that the affiliates might perform under the contracts in such a manner as to inflate the costs beyond a just and reasonable figure will be avoided so long as the

Commission looks past the designation of the figure as "cost" to determine the reasonableness of the figure as we have held it was required to do in case No. 8010UC827.

The order granting the rate increase (No. 8010UC827) is reversed and remanded to the Utilities Commission for further hearing. The order approving the utility's contracts with WSC (No. 8010UC1060) is affirmed.

Judges ARNOLD and MARTIN (Harry C.) concur.