STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION; AND CAROLINA POWER AND LIGHT COMPANY (APPLICANT); RUFUS L. ED-MISTEN, ATTORNEY GENERAL; EXECUTIVE AGENCIES OF THE UNITED STATES GOVERNMENT AND UNION CARBIDE CORPORATION v. NORTH CAROLINA TEXTILE MANUFACTURERS ASSOCIATION, INC.; THE PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION; AND KUDZU ALLIANCE

No. 8110UC698

(Filed 2 November 1982)

1. **Utilities Commission § 24— incorporating increase allowed in fuel cost adjustment proceeding into final rate case—no error**

It was not reversible error for the Utilities Commission to incorporate the increase it allowed in a fuel cost adjustment proceeding in the final order in the general rate proceeding since, under the statutory procedure provided, there is no reason to reconsider the same fuel cost in a general rate case, although questions concerning efficiency of operations, heat rate, and plant availability should be considered in a general rate case. G.S. 62-134(e), G.S. 62-130(a), and G.S. 62-92(e).

2. **Utilities Commission § 38— matching expenses with revenues associated with new coal fired units**

The Court's examination of the evidence led to the conclusion that a real effort was made by the Commission to properly match all items in a cost of service study associated with a new coal fired unit by considering the revenues which the new unit would produce with the increased expenses caused by the unit.

3. **Utilities Commission § 24— reasonableness of CWIP expenditures**

There is nothing in either G.S. 62-133(b)(1) or G.S. 62-133(c) which requires a finding that expenditures for construction work in progress, CWIP, will be used and useful within a reasonable time. The only expenditure for CWIP which can properly be included in rate base are *reasonable* expenditures, and the Commission made findings that the amount included for CWIP was reasonable and the findings were amply supported by the evidence.

4. **Utilities Commission § 24— CWIP statute constitutional**

The statute dealing with CWIP, the 1977 CWIP amendment [G.S. 62-133 (b)(1) and (c) ] is constitutional.

5. **Utilities Commission § 39— ratemaking—normalization of income tax effect of certain expenses—proper**

The Commission's findings and conclusions that normalization, rather than the alternative ratemaking policy of flow-through, of the income tax effect of certain expenses is proper was supported by competent, material and substantial evidence and was therefore conclusive and binding on the Court.

State ex rel. Utilities Comm. v. N. C. Textile Mfrs. Assoc.

**6. Utilities Commission § 24- "peak and average" methodology for allocation of production facility costs proper**

   The Commission's adoption of the "peak and average" methodology for the allocation of production facility costs was not error. The rate allocation difference between high and low factor customers are not arbitrary but are reasonable and based upon actual system load conditions.

   Judge HEDRICK dissenting in part.

APPEALS by intervenors, The Public Staff, Kudzu Alliance, and North Carolina Textile Manufacturers Association, Inc., from final order of the Utilities Commission entered 15 January 1981. Heard in the Court of Appeals 8 March 1982.

On 9 May 1980, Carolina Power and Light Company (hereinafter CP&L) filed with the Utilities Commission its application for an increase in its rates and charges to the extent of $91,269,000 per year. Should the requested increase be granted, it would represent a return on equity of 15.0%, a return the Company alleged to be needed to finance its construction programs and efficiently provide electric power sufficient to meet the needs of its customers. The application alleged, in essence, that increases were necessary to enable the Company to earn a fair and reasonable rate of return on equity in order to attract the large amounts of new capital necessary to enable the Company to meet its electric responsibilities; to enable the Company to recover the cost of doing business and the offset for the impact of inflation; to enable the Company to begin to recover the actual expenses associated with the new coal fired unit, Roxboro No. 4; and to enable the Company to recover the expenses associated with construction work in progress and other plant additions, including the capital costs of Roxboro 4. With its application CP&L filed its proposed rates and tariffs and also written testimony and exhibits supporting the application.

On 5 June 1980, the Commission entered an order declaring that the proceedings constituted a general rate case pursuant to G.S. 62-137 and designated it as Docket E-2, Sub 391, setting the test period as the twelve-month period ending 30 September 1979; providing for public notice and intervention; suspending the proposed rates; setting the matter for hearing beginning on 22 September 1980 and requiring all intervenors to file their testimony at least 20 days prior to the hearing.

Orders were entered, on petitions duly filed, allowing North Carolina Textile Manufacturers Association, Inc. (hereinafter TMA); United States of America, Department of the Navy; the Kudzu Alliance; and Union Carbide Corporation to intervene. The Public Staff and the Attorney General filed notice of intervention pursuant to G.S. 62-15(d) and G.S. 62-20. All intervenors filed prehearing testimony and exhibits in response to the directions of the 5 June order.

Hearings began on 22 September and continued through 15 October 1980. During that period, and on 26 September 1980, CP&L filed an application for rate increases for the period from December 1980 through March 1981 to reflect increases in fuel costs incurred from May through August 1980. This fuel adjustment proceeding was designated as Docket No. E-2, Sub 402. Hearing was set for 13 October. TMA and the Public Staff intervened in that proceeding, also.

On 8 October 1980, TMA moved in both proceedings that the fuel cost adjustment proceeding and the general rate case be consolidated and the test period for the consolidated matters be designated as the twelve months ending on 31 August 1980. The Commission, on 10 October, denied the motion for consolidation but did order that the record in the fuel adjustment hearing be incorporated in the general rate proceeding. On 24 October, the Commission entered its order in the fuel adjustment hearing. TMA and the Public Staff appealed. The appeal in that case (Docket No. E-2, Sub 402, Court of Appeals No. 8110UC392) was consolidated with this appeal for oral argument. Opinion by Hedrick, Judge, in No. 8110UC392 was filed 29 July 1982.

On 8 December 1980, the Commission filed its Notice of Decision and Order allowing CP&L a rate increase of $71,811,000 per year and ordering CP&L to file within three days new rate schedules reflecting this increase. CP&L complied, and on 11 December, the Commission entered an order approving these new rates and allowing them to be put into effect. Final Order Granting Partial Increase in Rates and Charges was filed 15 January 1981. This order affirmed the increase set out in the Notice of Decision and contained extensive findings of fact and conclusions of law. From the entry of this order, TMA, the Public Staff, and the Kudzu Alliance appealed assigning error to certain of the findings and conclusions.

*Thomas R. Eller, Jr., for appellant North Carolina Textile Manufacturers Association, Inc.*

*Thomas S. Erwin for appellant Kudzu Alliance.*

*Robert F. Page, Chief Counsel, and Karen E. Long for appellant, The Public Staff.*

*Hunton and Williams, by Robert C. Howison, Jr., and Edward S. Finley, Jr., and Richard E. Jones and Robert S. Gillam, for appellee, Carolina Power and Light Company.*

MORRIS, Chief Judge.

All three of the appellants have excepted to the failure of the Commission to combine the fuel adjustment clause proceeding (Docket No. E-2, Sub 402, our No. 8110UC392) with the general rate case, and all three have assigned this as error and have brought the exceptions forward and argued them. They argue here, as they did in No. 8110UC392, that to allow an increase in rates based on increased fuel costs in an expedited proceeding under G.S. 62-134(e) where there is no provision for inquiry into the reasonableness of the increased fuel costs rather than in a general rate case wherein inquires into the reasonableness of CP&L's management practices are required constitutes reversible error. Intervenors also argue here, as they did in 8110UC392, that it was reversible error for the Commission to incorporate the increase allowed in Docket No. E-2, Sub 402 resulting from increased fuel costs in the final order in this case because to do so precluded any inquiry into the reasonableness of the increased fuel costs even in the general rate case.

The first of these positions was answered adversely to intervenors, and we affirm that position here without further discussion. The second position was not answered because it was not necessary for decision. See *State of North Carolina ex rel. Utilities Comm., et al v. Public Staff—North Carolina Utilities Comm., et al,* 58 N.C. App. 480, 293 S.E. 2d 880 (1982).

[1] The Commission is bound by law to recognize the right of CP&L to avail itself of the mechanism provided by the legislature in G.S. 62-134(e) and apply for an increase in rates to offset the increased cost of fuel in an expedited proceeding totally separate

and apart from a general rate case. See *State ex rel. Utilities Com'r v. Lumbee River Electric Membership Corp.*, 275 N.C. 250, 166 S.E. 2d 663 (1969). In this proceeding the same opportunity exists for intervention as exists in a general rate case. Indeed, both TMA and the Public Staff intervened in the fuel cost adjustment proceeding. They had the opportunity to present whatever testimony and exhibits they wished to counter CP&L's evidence of increased fuel costs. The statute, G.S. 62-134(e), requires the Commission to investigate an application filed pursuant to it, requires the Commission to hold a public hearing, and provides that the Commission's order shall be based upon the record adduced at the hearing, "such record to include all pertinent information available to the Commission at the time of the hearing." The action of the Commission is subject to appellate review. Under the statutory procedure provided, we perceive no reason to reconsider the same fuel costs in a general rate case, although questions concerning efficiency of operations, heat rate, and plant availability should, of course, be considered in a general rate case. That the Commission's action in incorporating the increase allowed in Docket No. E-2, Sub 402, in the order in this case was authorized by statute is demonstrated by the Supreme Court's observation in *Utilities Comm. v. Edmisten*, 291 N.C. 451, 232 S.E. 2d 184 (1976), an appeal by the Attorney General from the allowance by the Commission of the imposition by Duke Power Company of a temporary surcharge necessitated by the sharp increase in coal costs occurring since the end of the year used in the then pending rate case. Justice Lake said:

> G.S. 62-134(e) did not roll back electric power rates. On the contrary, *it authorized the Commission, after hearing, to incorporate into the basic rates of the utility,* chargeable on and after 1 September 1975, *an increase determined by the then cost of coal.*

*Id.* at 466. We find no error in this portion of the Commission's order.

The Utilities Commission was, of course, created by the General Assembly. In fixing rates to be charged by utilities, it exercises a legislative function and has no authority other than that given to it by the Legislature. *Utilities Comm. v. Edmisten*, supra, and cases there cited. G.S. 62-130(a) places upon the Com-

mission the burden of making, fixing, establishing, or allowing "just and reasonable rates for all public utilities subject to its jurisdiction," and G.S. 62-94(e) provides that "[u]pon any appeal, the rates fixed . . . by the Commission under the provisions of this Chapter shall be prima facie just and reasonable." The Commission as fact finder, determines the credibility of the evidence, and its findings of fact "which are supported by competent, material and substantial evidence, are conclusive", and we are bound by them. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 336, 189 S.E. 2d 705, 717 (1972). This Court may not substitute its judgment, either with respect to factual disputes or policy disagreements, for that of the Commission. See *Utilities Comm. v. Edmisten*, 291 N.C. 424, 230 S.E. 2d 647 (1976); *State ex rel. Duke Power Co.*, 285 N.C. 377, 206 S.E. 2d 269 (1974); *State ex rel. Utilities Comm. v. City of Durham*, 282 N.C. 308, 193 S.E. 2d 95 (1972).

> The burden of showing the impropriety of rates established by the Commission lies with the party alleging such error. See *Utilities Commission v. Light Co.* and *Utilities Commission v. Carolinas Committee*, 250 N.C. 421, 109 S.E. 2d 253 (1959). The rate order of the Commission will be affirmed if upon consideration of the whole record we find that the Commission's decision is not affected by error of law and the facts found by the Commission are supported by competent, material and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn. See *Utilities Comm. v. Springdale Estates Assoc.*, 46 N.C. App. 488, 265 S.E. 2d 647 (1980).

*Utilities Commission v. Duke Power Co.*, 305 N.C. 1, 10, 287 S.E. 2d 786, 792 (1982).

Adhering to those fundamental legal principles in applying the statutory provisions to the issues brought forward in this appeal, we are unable to find reversible error.

[2] The Commission included the Roxboro Unit No. 4 at $123,565,000. CP&L's evidence placed cost of construction at $204,619,000. The Public Staff's witness Lam recommended that the unit be valued at $194,447,880. His value was reduced because, in his opinion, if the higher value were used, the plant should be able to produce 720 MW reliably, whereas the evidence is that it is a 650 MW plant. Appellant TMA concedes in its brief

that "the Commission properly allowed an adjustment to CP&L's rate base in the amount of $123,565,000" for the increase in plant cost caused by Roxboro Unit No. 4 and further that the Commission made adjustments to increase depreciation expense, depreciation reserve, and operating expenses associated with Roxboro Unit No. 4. Intervenor appellants argue, however, that the Commission was required to and did not make matching adjustments for revenue increase, decreased fuel expenses resulting from the plant's greater efficiency, lowered operating and maintenance expenses resulting from Roxboro No. 4's displacement of older plants with higher maintenance costs.

As is usually the case in proceedings of this type, the evidence is, of course, voluminous. The record and briefs comprise more than 700 pages. Our examination of the evidence leads us to the conclusion that a real effort was made properly to match all items in the cost of service study. There was no specific evidence with respect to how much, if any, the revenues of the Company would be increased by reason of inclusion of Roxboro Unit No. 4. There was testimony that the plant would not produce new customers. While Intervenor's expert witnesses seemed to agree that matching should apply to Roxboro No. 4, there was simply no specific evidence with respect to figures to rebut the evidence of CP&L. With respect to the decreased fuel cost, obviously under the statutory scheme of rate setting in effect at the time, any savings in fuel cost would be taken into account in a fuel cost adjustment proceeding.

Kudzu and TMA contend that the Commission made insufficient findings with respect to the Construction Work in Progress (CWIP) included in rate base. TMA argues, in the alternative, that if CWIP was properly included in rate base in this case, the 1977 CWIP Amendment [G.S. 62-133(b)(1) and (c)] is unconstitutional because so lacking in standards as to be in excess of the limitations on legislative power contained in the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 19 of the Constitution of North Carolina.

[3] With respect to the first argument (Kudzu assignments of error 1, 2, 3, 4, 5 and 6 and TMA's assignment of error 2), appellants contend that the 1977 revision to G.S. 62-133 requires detailed,

State ex rel. Utilities Comm. v. N. C. Textile Mfrs. Assoc.

specific findings by the Commission with respect to expenditures as to whether the expenditures for CWIP were "reasonable and prudent" and that they were made for a plant which the Commission expressly finds will be "used and useful within a reasonable period of time after the test period."

G.S. 62-133(b)(1) provides that, in fixing rates which will be fair both to the public utility and the consumer, the Commission shall

Ascertain the reasonable original cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within this State, less that portion of the cost which has been consumed by previous use recovered by depreciation expense plus the reasonable original cost of investment in plant under construction (construction work in progress). In ascertaining the cost of the public utility's property, construction work in progress as of the effective date of this subsection shall be excluded until such plant comes into service but reasonable and prudent expenditures for construction work in progress after the effective date of this subsection shall be included subject to the provisions of subparagraph (b)(5) of this section.

G.S. 62-133(c) provides:

The original cost of the public utility's property, including its construction work in progress, shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time. The test period shall consist of 12 months' historical operating experience prior to the date the rates are proposed to become effective, but the Commission shall consider such relevant, material and competent evidence as may be offered by any party to the proceeding tending to show actual changes in costs, revenues or the cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within this State, including its construction work in progress, which is based upon circumstances and events occurring up to the time the hearing is closed.

We find nothing in either section which requires a finding that the CWIP will be used and useful within a reasonable time. The statute clearly requires that the Commission establish the rate based by ascertaining "the *reasonable* original cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period . . . plus the *reasonable* original cost of investment in plant under construction (construction work in progress)."

There can be no question but the Legislature mandates that the only expenditures for CWIP which can properly be included in rate base are *reasonable* expenditures. The Commission so found in Finding No. 8:

> That the reasonable original cost of CP&L's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within this State, less that portion of the cost which has been consumed by previous use recovered by depreciation expense, plus the reasonable original cost of investment in plant under construction (construction work in progress or CWIP) is $1,544,143,000.

and again in Finding No. 10:

> That CP&L's reasonable original cost rate base is $1,630,739,000. This amount consists of net utility plant in service and construction work in progress of $1,544,143,000, plus a reasonable allowance for working capital and deferred debits and credits of $86,596,000.

Our review of the record leads us to the conclusion that the finding is amply supported by the evidence. Without going into great detail we simply note a few examples which we think will suffice to demonstrate that the finding is supported by the evidence. Mr. Smith, on cross examination by TMA, testified from Exhibit H, filed with the Commission, with respect to the $213,792,201 reflected in the exhibit as CWIP. He testified further that an inventory by groups of property could be supplied. Counsel for TMA responded that he wasn't asking that that information be supplied. There was testimony from both Mr. Smith and Mr. Bradshaw that the Public Staff of the Utilities Commission had audited the amount included. There was testimony the

figure included was based on expenditures from October 1979 through March 1980 on certain generating units; that CP&L planned to phase in the CWIP in the rate base over a period of time and the amount included in this filing did not include all that to which the Company was entitled; that $81,531,308 of the amount had previously been approved; the Company files quarterly reports with the Commission which are analyses of Construction Work in Progress; the figures have been completely verified and include the four generating units at the Harris Plant and the two generating units at the Mayo Plant; the analyses submitted to the Commission quarterly on construction work in progress cover literally hundreds of items of construction work in progress. We note also that the Public Staff's figure with respect to CWIP was the same as the Company's, adjusted only for jurisdictional allocation. It is elementary law in utility matters that the rates fixed by the Commission are deemed just and reasonable. The Legislature has so provided. G.S. 62-132, G.S. 62-94(e). "The burden of showing the impropriety of rates established by the Commission lies with the party alleging such discrimination." *Utilities Comm. v. Edmisten*, 291 N.C. 424, 428, 230 S.E. 2d 647, 650 (1976). To require the Company to introduce evidence with respect to every item comprising CWIP would be an exercise in futility. The burden of proof would be unduly and unnecessarily burdensome, and the ratemaking process would become even more time consuming and difficult of administration. In *Utilities Comm. v. Telephone Co.*, 12 N.C. App. 598, 184 S.E. 2d 526 (1971), *modified and affirmed* 281 N.C. 318, 189 S.E. 2d 705 (1972), we said:

> Where the property has been purchased from a stranger, ordinarily the price actually paid by the utility would be considered its reasonable cost, though it would not necessarily be so. Even in such a case the Commission may find the management of the utility acted improvidently or carelessly and paid a price greater than reasonable.

*Id.* at 12 N.C. App. at 606, 189 S.E. 2d at 531. *See also West Ohio Gas Co. v. Ohio Public Utilities Commission*, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935).

There has been no contention here that the Company acted improvidently or carelessly. Nor does the record before us reflect

any evidence at all that the amount shown for CWIP was in any manner unreasonable. *See Alabama Public Service Com'n. v. Southern Bell Telephone & Telegraph Co.*, 253 Ala. 1, 42 So. 2d 655 (1949), where the Court said the Commission had discretion to disallow expenses actually incurred only where affirmative evidence is offered challenging the reasonableness of the operating expenses incurred. The Commission's finding that the amount included for CWIP was reasonable is amply supported by the evidence.

[4] Nor do we find merit in the argument that the statute is unconstitutional. In *Utilities Comm. v. Edmisten, Attorney General*, 294 N.C. 598, 610, 242 S.E. 2d 862, 870 (1978), the Court said:

> Stimulation of the economy is an essential public and governmental purpose and the manner in which this purpose is to be accomplished is, within constitutional limits, exclusively a legislative decision. *Mitchell v. North Carolina Industrial Development Financing Authority*, 273 N.C. 137, 159 S.E. 2d 745 (1968). The authority to set rates to be charged by a public utility for its services rests in the Legislature and is delegated by it to the Utilities Commission under sufficient rules and standards to guide the Commission in exercising this power. *Utilities Commission v. State*, 239 N.C. 333, 80 S.E. 2d 133 (1954).

*See also Utilities Comm. v. Intervenor Residents*, 52 N.C. App. 222, 278 S.E. 2d 761, *rev'd on other grounds*, 305 N.C. 62 (1981). The 1977 amendment including CWIP in rate base did not lessen the rules and standards. Reasonableness remains the standard.

[5] Appellant Public Staff argues that the Commission erred by failing to adjust properly CP&L's accumulated deferred federal income tax balance in light of the decrease in the federal corporate income tax rate. The tax rate was decreased from 48 percent to 46 percent after the end of the 12-month test period but prior to the hearings in this matter. The Public Staff contends that CP&L's continuation of its use of a normalization policy in which future taxes will be credited for book purposes at the 48 percent rate, even though a different rate may be in effect at that time, is discriminatory because the ratepayers who benefit from the reduction in tax rate may not be the ratepayers who existed at the time of the deferral. The Public Staff recommends adoption

of a flow-through policy for income tax expense, rather than the normalization policy utilized by CP&L.

Flow-through and normalization are alternative ratemaking policies for determining the cost component of a regulated utility's cost of service. Under flow-through, ratepayers realize the tax benefits of expenses at the time those expenses are used as tax deductions by the utility. Normalization defers this tax benefit until the expense is recovered through the rates.

The Public Staff presented the expert testimony of two accountants in support of their recommendation that the Commission employ flow-through. Their testimony indicated that CP&L will continue to receive a tax reduction every year for items which are capitalized for book purposes but are expensed for tax purposes, resulting in an ongoing tax savings. Normalization results in higher rates to consumers than would exist under flow-through. The Public Staff argued that the tax effect of an expense should be recognized in the same period as the expense itself to achieve equity between present and future ratepayers.

CP&L's accounting experts rebutted this testimony by stating that over the life of a transaction, the total amount of the transaction recognized for ratemaking will equal the total amount recognized for tax purposes. CP&L argued that over the life of an asset which generates deferrals, the total revenue requirement is greater under flow-through than under normalization. When viewed on a present-worth basis, the revenue requirement between normalization and flow-through is virtually equal before any allowance is made for the adverse impact flow-through has on such factors as debt coverage and cash flow. Since plant items which generate deferrals are used to provide service over a useful life period, normalization properly allocates the annual benefit of the deferral to the consumer using the service which created the deferral. CP&L witness Utley testified that Congress, the accounting profession and many federal administrative agencies endorse normalization accounting.

After hearing the testimony on this issue, the Commission found as a fact and concluded as a matter of law that normalization of the income tax effect of certain expenses is proper. The Commission found that the arguments in favor of normalization "clearly outweighed the arguments of the Public Staff in support

of flow-through." The Commission summarized CP&L's compelling arguments as follows:

(1) Normalization as opposed to flow-through results in a better matching of revenues and costs.

(2) Normalization as opposed to flow-through results in the most equitable allocation of costs and benefits among present and future customers.

(3) Normalization as opposed to flow-through materially improves the Company's financial position with respect to cash flow.

(4) Normalization as opposed to flow-through materially improves key financial ratios (e.g., fixed charge coverage rates, effective tax rates, etc.) used by the investment community in determining the rental rate its members will charge for the use of its capital—the more favorable the ratios the lower the capital costs.

(5) Normalization as opposed to flow-through results in more informative disclosure in financial reporting with respect to an entity's potential future income tax liability.

(6) Normalization as opposed to flow-through when limiting one's considerations solely to a present worth analysis (i.e., without considering advantages of normalization), when based upon realistic assumptions, results in economic advantages to both the Company and its customers.

Based upon our review of the record, we hold that the findings of fact made by the Commission on this issue (finding of fact No. 6) was supported by competent, material and substantial evidence and is, therefore, conclusive 'and binding on this Court. *Utilities Comm. v. Telephone Co.*, supra. A finding of fact cannot be reversed or modified by a reviewing court merely because the court would have reached a different finding upon the evidence. *Id.* We, therefore, overrule this assignment of error.

[6] CP&L recommended that a "peak and average" methodology be adopted, and this was accepted by the Commission, as its final order reflects. Appellants TMA and Kudzu assign as error the Commission's adoption of the "peak and average" methodology for the allocation of production facility costs. The allocation proc-

State ex rel. Utilities Comm. v. N. C. Textile Mfrs. Assoc.

ess involves a determination of which jurisdictions and which classes of customers are responsible for particular portions of costs of providing service. CP&L, the Public Staff, and TMA supported abandonment of the traditional one-hour summer coincident peak allocation formula, which has been used for the past ten years to separate plant, or demand-related, costs between the service jurisdictions of South Carolina and North Carolina. At the hearing expert witnesses proposed three different methods for allocation of demand-related costs associated with production facilities: CP&L's peak and average method; appellant Public Staff's peak and base method; and appellant TMA's use of the average of summer and winter one-hour coincident peaks, which was endorsed by appellant Kudzu.[1]

In its order the Commission described the extensive testimony of the expert witnesses concerning demand allocation and evaluated the advantages and disadvantages of each proposed method. While recognizing that each method had merit, the Commission concluded that "the peak and average method for making cost of service allocation is the most appropriate method for use in this proceeding." Based upon our review of the testimony contained in the record, we find that the finding of fact on this issue is fully supported by competent, material and substantial evidence and is, therefore, conclusive. *Utilities Comm. v. Telephone Co.,* supra.

The peak and average method separates demand-related costs to retail customers into two categories: one allocated according to demand at the time of the system peak and one allocated on the basis of respective cost responsibilities for the average annual demand as determined by the system load factor. These two portions reflect peak and average production costs and are based upon actual system load conditions. CP&L's expert witness Nevil stated that this method promotes cost-based rates by better matching cost of production plant with each jurisdiction's or class of customers' use of specific types of plant. The peak and base method recommended by the Public Staff is very similar to the peak and average method. The only difference is the portion of

---

1. Intervenor Federal Government agencies, not an appellant in this appeal, supported continuation of the one-hour summer coincident peak method.

the investment to be allocated by average demand and the coincident peak.

TMA advocated the use of a summer-winter average peak demand method in which the production costs are allocated in proportion to the usage of each class of customers at the time of the seasonal peaks. The Commission stated that this proposed method differs little from the traditional one-hour summer coincident peak formula and suffers some of the same weaknesses. Both methods assign a lesser portion of demand costs to general service customers than do either peak and average or peak and base methods.

The Commission concluded that:

. . . the CP [coincident peak] allocation method no longer properly allocates demand costs to the jurisdictions or customer classes creating the need for the type of generating facilities actually being constructed today. There is little difference between the Company's P&A [peak and average] and the Public Staff's P&B [peak and base] method but, conceptually, the P&A method better recognizes the use of all base load production facilities through the use of the system load factor to determine the portion of the investment to be allocated by average demand, as opposed to the P&B method which uses the relationship of minimum weekday demands to the coincident peak demand. The minimum weekday demand is of short duration and is much less than the total base load capacity available, whereas the load factor better reflects the average use of production facilities — the use for which they were constructed — and therefore is an appropriate method of allocating the majority of the plant costs.

Appellants argue that the peak and average method unfairly benefits customers with lower load factors and penalizes customers with higher load factors. G.S. 62-140 prohibits public utilities from making or granting any unreasonable preference or advantage to any customer and from establishing "any unreasonable difference as to rates or services either as between localities or as between classes of service." *Utilities Com. v. Mead Corp.,* 238 N.C. 451, 78 S.E. 2d 290 (1953).

The evidence indicates that the use of the peak and average method would increase the cost of electricity for high load factor

customers. However, the evidence also shows that the method balances the average usage of production facilities throughout the year with related cost. Use of this method recognizes that since higher load customers receive the continuing benefit of energy savings from more efficient base load facilities, they should also share in the increased capital costs related to those facilities. Classifications of customers and differences in rates must be "based on reasonable differences in conditions and . . . the variance in charges [must bear] a reasonable proportion to the variance in conditions." *Utilities Comm. v. Edmisten, Attorney General*, 29 N.C. App. 428, 440, 225 S.E. 2d 101, 109, *aff'd*, 291 N.C. 424, 230 S.E. 2d 647 (1976). From our review of the record, we find that the rate allocation differences between high and low load factor customers are not arbitrary but are reasonable and based upon actual system load conditions. We, therefore, overrule this assignment of error.

The order of the Commission is, in all respects, affirmed.

Judge VAUGHN concurs.

Judge HEDRICK dissents.

Judge HEDRICK dissenting in part.

It appears from the order that the Commission derived CP&L's cost of fuel in this general rate case by using the fuel cost found reasonable by the Commission in a separate fuel clause proceeding. The Commission accomplished this result by consolidating the record in Docket No. E-2, Sub. 402, the fuel clause proceeding, into the record of this case. As we held in *Utilities Comm. v. Power Co.*, 48 N.C. App. 453, 269 S.E. 2d 657 (1980), *cert. denied*, 301 N.C. 531, 273 S.E. 2d 462 (1980), a fuel clause proceeding is an expedited one where the Commission may consider only the actual cost of fuel used. In that same opinion, we emphasized that in a general rate case, it is not only appropriate but necessary for the Commission to consider overall system efficiency in deriving the reasonable cost of fuel during the test year. The Commission used the fuel clause short-cut record to find the reasonable cost of fuel in this general rate case. In doing so, the Commission erred. The Commission's findings of fact as to

the reasonable cost of fuel during the test year is not, therefore, supported by the evidence *in this record*, and I, therefore, am of the opinion that this matter must be remanded for further hearings to determine CP&L's reasonable cost of fuel for the test year in this general rate case.