OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Consumers' Counsel *v.* Pub. Util. Comm. (1983), 6 Ohio St. 3d 469.]

(No. 82-1622—Decided September 7, 1983.)

Mr. William A. Spratley, consumers' counsel, Mr. Richard P. Rosenberry, Mr. Martin J. Marz and Mr. Richard Ganulin, for appellant.

Mr. Anthony J. Celebrezze, Jr., attorney general, Mr. Robert S. Tongren and Mr. James R. Bacha, for appellee Public Utilities Commission.

Mr. Russell J. Spetrino, Mr. Anthony J. Alexander and Mr. Michael A. Gribler, for intervening appellee Ohio Edison Co.

Messrs. Squire, Sanders & Dempsey, Mr. James H. Woodring, Mr. Alan P. Buchmann, Mr. Alan D. Wright and Mr. Craig I. Smith, for intervening appellee Cleveland Electric Illuminating Co.

Messrs. Fuller & Henry, Mr. Paul M. Smart and Mr. Fred J. Lange, Jr., for intervening appellee Toledo Edison Co.

Per Curiam. R.C. 4905.301 mandates a semiannual hearing to review the fuel component of public utility rate schedules. R.C. 4909.191 (C)[5] requires

---

[5] R.C. 4909.191 (C) provides:

"The electric light company shall demonstrate at the hearing on its fuel component that its acquisition and delivery costs were fair, just, and reasonable. The public utilities commission shall consider, to the extent applicable, at each hearing on a fuel component:

"(1) The efficiency of the electric light company's fuel procurement practices and policies;

"(2) The results of financial audits;

"(3) The results of performance audits;

the utility to demonstrate at the hearing that its acquisition costs[6] and delivery costs[7] were fair, just and reasonable. Conversely, R.C. 4909.191 (D)[8] requires the commission to readjust its rates when the commission finds that a utility has engaged in imprudent fuel procurement practices.

The appellant argues that the commission's order, substituting the "modified 115% method" for the "125% rule," was not based upon a demonstration that Ohio Edison's acquisition costs were fair, just and reasonable, but, rather, that these costs result from imprudent and unreasonable acquisition policies. The appellant does not argue that the commission was without jurisdiction to enter the present order. Rather, appellant argues that to do so was against the manifest weight of the evidence before the commission. We disagree.

In the recent case of *Consumers' Counsel v. Pub. Util. Comm.* (1983), 4 Ohio St. 3d 35, we discussed our role in reviewing the commission's factual determinations made in R.C. 4905.301 proceedings. At pages 36-37, we said:

"This court may disturb factual conclusions only when they are unreasonable or unlawful. R.C. 4903.13. In *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449, 453 [12 O.O.3d 378], the court said:

" '* * * Upon review of * * * factual conclusions, a finding of the commission will not be reversed unless it appears from the record that it is manifestly against the weight of the evidence or is so clearly unsupported by the record as to show misapprehension, mistake, or a willful disregard of duty.' " See, also, *Cleveland Electric Illuminating Co. v. Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403 [71 O.O.2d 393].

Here, the commission's factual conclusion is not "so clearly unsupported by the record as to show misapprehension, mistake, or a willful disregard of duty."

---

"(4) Compliance by the company with previous commission performance recommendations;

"(5) Such other factors as the commission considers appropriate. The requirements of divisions (C)(2) and (3) of this section shall not apply to an expedited hearing held pursuant to division (E) of this section."

[6] R.C. 4905.01 (F) defines "acquisition cost" as "the cost to an electric light company of acquiring fuel for generation of electricity."

[7] "Delivery cost" is defined by R.C. 4905.01 (E) as, "the cost of delivery of fuel, to be used for the generation of electricity, from the site of production directly to the site of an electric generating facility."

[8] R.C. 4909.191 (D) provides:

"The public utilities commission shall readjust the rates of the electric light company or order the company to refund any charges it has collected under its fuel component which the commission finds to have resulted from:

"(1) Errors or erroneous reporting;

"(2) Imprudent or unreasonable fuel procurement policies and practices;

"(3) Errors in the estimation of kilowatt hours sold;

"(4) Such other practices, policies, and factors as the commission considers appropriate."

The commission based its decision to replace the "125% rule" with the "modified 115% method" on staff testimony.[9] The staff recommended the "modified 115% method" should be adopted because circumstances had changed since the adoption of the "125% rule." First, less Quarto coal was being used at the Mansfield units.[10] Therefore, Quarto and other coal would be used at the Mansfield units. Because other than Quarto coal is used at Mansfield, the "modified 115% method" will provide Ohio Edison and the other CAPCO companies with an incentive to secure inexpensive coal so that actual Quarto costs can be recovered. Second, the staff testified, and the commission held, that the further accumulation of deferred costs would overly burden future ratepayers. Lastly, it was recognized that the ability of Ohio Edison to enter capital markets was becoming impaired as a result of the increasing deferred costs it was carrying.

Based on these factors and that the commission has had an extensive history of overseeing the Quarto project, we are unwilling to say that its decision was unreasonable.

In the alternative, appellant argues that the commission's order must be reversed because it violates R.C. 4905.01 (F). In pertinent part, R.C. 4905.01 (F) provides:

"* * * In the case of a coal supply owned or controlled in whole or in part by the company such term shall not exceed a price that is, in the judgment of the public utilities commission, reasonable when compared to the average cost per million British thermal units of similar quality coal purchased from all independent like mining operations under similar term contracts during the same period."

The appellant argues that because of the relationship between the development of the Quarto mines and CAPCO, Quarto coal was controlled, in part, by Ohio Edison. Hence, the commission erred in allowing Ohio Edison to recover more than the cost of similar, i.e., average, market price.

We disagree. As the commission stated in its opinion, even assuming CAPCO controlled Quarto, in part, R.C. 4905.01 (F) was not necessarily violated. In this case, we agree with the commission's analysis of R.C. 4905.01 (F), that:

"* * * Section 4905.01(F) does not reduce the comparison to a simple dollar comparison but rather includes other considerations such as long-term trends, long-term dependability, and long-term cost and supply interests. These matters have all been considered in the Commission's determination to

---

[9] It should be noted that the "125% rule" was not designed to preclude the recovery of actual costs incurred in the acquisition of Quarto coal. Its purpose was to defer the recovery of these costs until Quarto coal was being produced at below market costs. The appellant's expert witness agreed that the "125% rule" was reasonable.

[10] The projected use was reduced to 3.3 million tons annually from 4.7 million tons annually.

permit the CAPCO companies to pass through certain portions of Quarto coal costs and accumulated deferrals."

Based on the foregoing, we affirm the order of the commission.

*Order affirmed.*

CELEBREZZE, C.J., W. BROWN, SWEENEY, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

LOCHER, J., dissents.

LOCHER, J., dissenting. Once again a majority of this court confirms a company-oriented assault on the test-year concept. See, *e.g., Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 6 Ohio St. 3d 405, 410 (No. 83-1428) (Locher, J., dissenting); *Consumers' Counsel* v. *Pub. Util. Comm.* (1983), 6 Ohio St. 3d 412, 415 (No. 82-1461) (Locher, J., dissenting). Therefore, I must dissent.

In *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153, we refused to allow the utility to pass on the cost of cancelled nuclear plants to consumers. "It is our opinion that R.C. 4909.15 (A)(4) is designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period. * * *

"The extraordinary loss sustained by CEI in connection with the terminated nuclear plants cannot be transformed into an ordinary operating expense pursuant to R.C. 4909.15 (A)(4) by commission fiat. The commission's statement that '[c]ancellation does not create a past loss, but gives rise to a current cost' is unpersuasive. Under this rationale we question whether there could ever be a 'past loss' the return of which would not be recoverable in future ratemaking proceedings notwithstanding the commission's assertion to the contrary." 67 Ohio St. 2d, at 164.

Quarto resembles those cancelled nuclear plants in many ways. CAPCO invested heavily in a power source which was intended to yield lower rates in the future, but the market changed. Furthermore, the regulatory environment changed. Now, CAPCO wants to amortize that excessive past cost over market by charging current and future ratepayers.

CAPCO also exacerbated the situation by agreeing to provisions in the mining contract which encouraged sub-optimal production. This should be no surprise in that the facts, as summarized by the majority, leave little doubt that the entire Quarto project was not a completely arm's-length transaction.

For these reasons, the imposition of past losses on current and future ratepayers is *not* "fair, just, and reasonable." R.C. 4909.191 (C). Likewise, CAPCO has exhibited "imprudent * * * [and] unreasonable fuel procurement policies and practices." R.C. 4909.191 (D)(2). Although the commission is empowered to require electric power suppliers to meet the market, it refuses to do so.

Accordingly, I would reverse the order of the commission.