OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of Ohio
are being transmitted electronically beginning May 27, 1992,
pursuant to a pilot project implemented by Chief Justice Thomas J.
Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.  Your
comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised to
check the bound volumes of Ohio St.3d published by West Publishing
Company for the final versions of these opinions.  The advance
sheets to Ohio St.3d will also contain the volume and page numbers
where the opinions will be found in the bound volumes of the Ohio
Official Reports.

Industrial Energy Consumers of Ohio Power Company et al.,
Appellants, v. Public Utilities Commission of Ohio et al.,
Appellees.
[Cite as Indus. Energy Consumers of Ohio Power Co. v. Pub. Util.
Comm. (1994),    Ohio St.3d    .]
Public Utilities Commission -- Semi-annual review of electric fuel
     component rate -- Commission's adoption of stipulation, and
     its accelerated recovery provision, lawful under R.C.
     4905.301 and 4905.69.
     (Nos. 93-471 and 93-1861 -- Submitted December 14, 1993 --
Decided march 30, 1994.)
     Appeals from the Public Utilities Commission of Ohio, Nos.
92-01-EL-EFC, 92-101-EL-EFC and 93-01-EL-EFC.
     These consolidated appeals arise from appellee Public
Utilities Commission of Ohio's semi-annual reviews of intervening
appellee Ohio Power Company's electric fuel component ("EFC")
rate.  At issue in these cases, as in Ohio Power's previous EFC
cases, was the price at which to value coal from Ohio Power's
affiliate mining operations.[1]  In a previous EFC proceeding (In re
Ohio Power Co. [Sept. 6, 1990], PUCO No. 90-01-EL-EFC), the price
of affiliate coal was capped, by agreement of the parties in PUCO
No. 90-01-EL-EFC, at 175 cents per million British thermal units
("MMBtu") for a period of three years ending November 30, 1991.
     Pursuant to R.C. 4905.66(B)(2) and Ohio Adm. Code
4901:1-11-10, the commission appointed Energy Ventures Analysis,
Inc. ("EVA") to perform a management/performance audit of Ohio
Power's fuel-related policies and practices in PUCO No.
92-01-EL-EFC for the twelve-month period ending November 30,
1991.  During the audit period, the price of affiliate coal was
175.2 cents per MMBtu ($40.47 per ton), the price of the company's
non-affiliate contract coal was 152.4 cents per MMBtu ($36.18 per
ton), and the price of all coal acquired by the company (including
spot purchases) was 166 cents per MMBtu ($38.71 per ton).  EVA
concluded that by any measure (e.g., spot coal prices, new
contract prices, prices of old contracts) the price of affiliate
coal was in excess of market, and recommended that a new cap of
161 cents per MMBtu be placed on the price of all coal.
     Appellants Industrial Energy Consumers of Ohio Power Company

("IEC") and the Sierra Club, as well as the Office of Consumers' Counsel ("OCC"), were permitted to intervene in the proceeding, and a hearing was scheduled for March 16, 1992. The hearing was continued indefinitely to permit negotiations among the parties and, on August 13, 1992, the company, the commission's staff, and OCC (on behalf of Ohio Power's residential customers) entered into a stipulation to resolve PUCO No. 92-01-EL-EFC, as well as the company's subsequently filed EFC proceeding, PUCO No. 92-101-EL-EFC.

Among its several provisions, the stipulation: (1) set a predetermined price of 164 cents per MMBtu for all coal burned at Ohio Power's Gavin, Muskingum, Mitchell, and Cardinal plants for the period December 1, 1991 to November 30, 1994; (2) for the succeeding fifteen-year period, set a predetermined price of 157.5 cents per MMBtu, with quarterly adjustments, for all coal burned at the Gavin plant, on which Ohio Power proposed to install flue gas desulfurization equipment ("scrubbers")2 ; (3) provided the potential for accelerated recovery of Ohio Power's investment, related liabilities, and direct closure-related costs in the affiliated Meigs mine, in the event that Ohio Power reduces its cost of coal below the predetermined price levels; (4) provided that Ohio Power could not seek recovery of the above costs other than by decreasing its fuel costs below the predetermined price levels during the term of the stipulation; (5) granted Ohio Power's Ohio jurisdictional EFC customers an energy credit of 0.22 mills per kilowatt hour from December 1, 1994 to November 30, 1997; and (6) capped recovery of the scrubber costs at Gavin at the lesser of the actual construction costs or $815 million.

To support the stipulation, Ohio Power's witness testified that for the review period in PUCO No. 92-101-EL-EFC, affiliate coal was only eight percent above the level of non-affiliate contract coal. He further stated that the stipulated price caps of 164 cents per MMBtu and 157.5 cents per MMBtu were consistent with EVA's recommended three-year price cap of 161 cents per MMBtu, stating that the three-cent differential between EVA's recommendation and the stipulated cap of 164 cents per MMBtu can be attributable to post-employment benefit costs to be incurred in 1993 and beyond, which the auditor did not take into account.

Appellants opposed the stipulation arguing, inter alia, that it violated R.C. 4905.01.3 After hearing, the commission rejected appellants' arguments and approved the stipulation, using the following criteria, which this court recently endorsed in Consumers' Counsel v. Pub. Util. Comm. (1992), 64 Ohio St.3d 123, 126, 592 N.E.2d 1370, 1373:

"1. Is the settlement a product of serious bargaining among capable, knowledgeable parties?

"2. Does the settlement, as a package, benefit ratepayers and the public interest?

"3. Does the settlement package violate any important regulatory principle or practice?"

Specifically, the commission found that the parties to the stipulation were capable and knowledgeable, noting their involvement with the issues presented over a number of years.

As to the second criterion, it noted benefits to the ratepayers and the public interest, finding that "ratepayers will receive cost savings and EFC rate stability through the price caps and energy credit provisions of the stipulation, as well as

through the cap on the cost of Gavin scrubbers."

As to the third criterion, the commission found, inter alia, (1) that the price of affiliate coal was reasonable under R.C. 4905.01(F) when "compared to the average cost per [MMBtu] of similar quality contract coal" purchased by the company; (2) that R.C. 4905.01(F) permitted setting a price for affiliate coal which is higher than non-affiliate coal, citing Consumers' Counsel v. Pub. Util. Comm. (1983), 6 Ohio St.3d 469, 6 OBR 521, 453 N.E.2d 711; and (3) that it had the authority under R.C. 4905.301 and 4905.69 to approve the stipulation, and the provision permitting the accelerated recovery of Ohio Power's affiliate mining investment and related liabilities, as an incentive for the company to exercise efficient fuel procurement practices to help minimize the cost of electric service.

Appellants' joint application for rehearing of the commission's order was denied, and appellants timely appealed to this court. During the pendency of the appeal, the commission also issued its order in Ohio Power's next EFC proceeding, PUCO No. 93-01-EL-EFC. IEC raised essentially the same arguments in that case, which the commission again rejected in its order and on rehearing. IEC also appealed that order, which has been consolidated with the previous appeal.

The causes are before this court as a matter of right.

Emens, Kegler, Brown, Hill & Ritter, Samuel C. Randazzo, Richard P. Rosenberry and Denise C. Clayton, for appellant, Industrial Energy Consumers of Ohio Power Company.

Hahn Loeser & Parks, Janine L. Migden and Maureen R. Grady, for intervening appellant Sierra Club in case No. 93-471.

Lee Fisher, Attorney General, James B. Gainer and William L. Wright, Assistant Attorneys General, for appellee commission.

Edward J. Brady, Marvin I. Resnik and Richard Cohen, for intervening appellee Ohio Power Company.

Per Curiam. Pursuant to R.C. 4909.191(C), Ohio Power has the burden of proving that its fuel acquisition and delivery costs are "fair, just, and reasonable." The stipulation of some of the parties to this proceeding is, in itself, insufficient to satisfy this burden. Rather, such stipulations are considered merely as recommendations to the commission and, while entitled to substantial weight, they must be supported by the evidence of record to withstand scrutiny under the standard of review provided in R.C. 4903.13. Office of Consumers' Counsel (1992), supra. See, also, Akron v. Pub. Util. Comm. (1978), 55 Ohio St.2d 155, 157, 9 O.O.3d 122, 123, 378 N.E.2d 480, 483; Duff v. Pub. Util. Comm. (1978), 56 Ohio St.2d 367, 379, 10 O.O.3d 493, 499, 384 N.E.2d 264, 273. Under that standard, this court will not reverse or modify a commission order as to questions of fact where the record contains sufficient probative evidence to show that the commission's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. However, as to questions of law, this court has complete and independent power of review. MCI Telecommunications Corp. v. Pub. Util. Comm. (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780. We review appellants' two propositions of law with these standards in mind.

R.C. 4905.01(F) requires the commission to establish a cost for affiliate coal that is reasonable when compared to the price of coal "purchased from all independent like mining operations." Appellants argue that the commission erred by comparing the aggregate cost of Ohio Power's affiliate coal to the aggregate price of the company's non-affiliate contract purchases. They contend (1) that the word "all" requires a comparison to non-affiliate coal purchases made by a larger, albeit unspecified, group of electric utilities, and (2) that the phrase "like mining operations" requires a comparison of the coal costs of each affiliated mine to purchases from non-affiliated mines which use the same mining techniques (e.g., longwall).

The phrase at issue begs the question: "Purchased by whom?" We find no support in the language of the statute for appellants' construction. Rather, the phrase's only antecedent ("by the company") supports the commission's long-standing administrative interpretation of the statute (see Ohio Adm. Code 4901:1-11-10[G][12]4), which we find to be reasonable. R.C. 1.42.

Nor do we find a basis for reversal by reason of the commission's comparison of the numerous affiliate and non-affiliate mining operations in the aggregate. By their argument, appellants speculate that non-affiliate prices under their preferred methodology would be lower and, further, that the lower non-affiliate price would compel the commission to set a lower price for affiliate fuel. We found such speculation insufficient to sustain the appellants' burden in Consumers' Counsel (1992), supra, and find it particularly so in this case, considering the discretion which R.C. 4905.01 vests in the commission in setting the price of affiliate coal. See Consumers' Counsel (1983), supra. We conclude, on this record, that the commission's comparison of affiliate prices to the company's non-affiliate contract purchases amply supports its determination.

As set forth above, the stipulation provides that if Ohio Power is able to reduce its actual fuel costs during a given period below the predetermined price, the company may apply the difference to accelerate recovery of its affiliate mining investment, related liabilities, and direct closure-related costs.5 Appellants argue that this provision is unlawful because it would require current EFC customers to pay more than the actual fuel acquisition costs attributable to them. They rely on Ohio Power Co. v. Pub. Util. Comm. (1978), 54 Ohio St.2d 342, 8 O.O.3d 353, 376 N.E.2d 1337, in which we found that "[f]uel adjustment clauses are not and may not be permitted to become carte blanche authorization to an electric utility to pass through to its tariff customers expenses other than fuel costs fairly attributable to the production of the service to those customers." Id. at 344, 8 O.O.3d at 354, 376 N.E.2d at 1338. See, also, Pike Natural Gas Co. v. Pub. Util. Comm. (1981), 68 Ohio St.2d 181, 22 O.O.3d 410, 429 N.E.2d 444, and Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm. (1986), 28 Ohio St.3d 171, 28 OBR 262, 503 N.E.2d 167.

While we reaffirm the general principles enunciated in the above cases, we note that we have also permitted a utility to recover other than its actual fuel acquisition and delivery costs through the EFC rate pursuant to R.C. 4905.301 and 4905.69,6 when

the rate provided positive energy efficiency incentives and helped to minimize the cost of electric service to the benefit of the utility and its consumers alike. See Consumers' Counsel v. Pub. Util. Comm. (1978), 56 Ohio St.2d 319, 10 O.O.3d 443, 384 N.E.2d 245, and Consumers' Counsel v. Pub. Util. Comm. (1979) 57 Ohio St.2d 78, 11 O.O.3d 245, 386 N.E.2d 1343, in which we upheld the recovery of purchased power costs through the EFC when less than the utility's own generation costs.

Appellants argue that the above cases are not controlling, claiming that when the General Assembly subsequently enacted R.C. 4909.159 to specifically include the recovery of purchased power costs through the EFC rate, it explicitly excluded the recovery of all other non-acquisition or delivery costs by providing that "[n]o other charges may be allowed in the rule promulgated pursuant to divisions (C) and (E) of section 4905.69 of the Revised Code." R.C. 4909.159(B). We disagree.

R.C. 4909.159 addresses only purchased power costs. The prohibition against recovering "other charges" through the EFC rate relates only to charges (e.g., demand charges) incurred in purchasing the power in question. Indeed, the statute permits recovery of even those charges in cases where the transaction reduces a utility's fuel costs. The statute does not restrict the commission's authority to establish other cost incentives for efficient fuel procurement practices under R.C. 4905.69(C), nor does it affect the commission's authority under R.C. 4905.301. We recognized as much in Consumers' Counsel v. Pub. Util. Comm. (1992), 63 Ohio St.3d 531, 589 N.E.2d 1273, in which we upheld the commission's allowance of legal fees incurred in acquiring a new leasehold interest in nuclear fuel when the transaction significantly reduced the fuel costs of the utility and its customers.

Appellants do not dispute that Ohio Power will be provided an incentive to reduce its fuel costs under the stipulation and that the company's consumers will receive a benefit to which they would not otherwise be entitled through the 0.22 mill per kilowatt hour energy credit. Moreover, as discussed above, the commission has found that the company's affiliate coal prices at issue in this case are reasonable. Thus, the stipulation would provide an incentive to the company, which might not otherwise be present, to reduce those costs even further. Although the potential further reductions would not be immediately passed on to consumers, we cannot find that EFC customers would be paying more than they would have absent the stipulation. Indeed, the stipulated cap of 164 cents per MMBtu is below the company's average costs during the audit period of 166 cents per MMBtu. Accordingly, we find the commission's adoption of the stipulation, and its accelerated recovery provision, to be lawful under R.C. 4905.301 and 4905.69.

Based on the foregoing, the order of the commission is affirmed.

Order affirmed.

Moyer, C.J., A.W. Sweeney, Douglas, Fain, Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

Mike Fain, J., of the Second Appellate District, sitting for Wright, J.


FOOTNOTES
1    Of these affiliates, Southern Ohio Coal Company operates the

Meigs mine, which supplies Ohio Power's Gavin Plant, Central Ohio Coal Company operates the Muskingum mine, which supplies the Muskingum River Plant, and Windsor Coal Company operates the Windsor mine, which supplies the Cardinal plant. Until July 1, 1992, Southern Ohio Coal Company also operated the Martinka mine, which supplied Ohio Power's Mitchell plant. As of that date, the mine was sold to Peabody Development Company, whose affiliate now supplies coal to Mitchell under a long-term contract.

2    See Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm. (1994),    Ohio St.3d    ,    N.E.2d    , decided this date, which upholds Ohio Power's proposal to install scrubbers at the Gavin plant as a part of its plan to comply with Phase I of the Clean Air Act Amendments of 1990.

3    R.C. 4905.01(G) defines the "fuel component" as the "acquisition and delivery costs of fuel for the generation of electricity, including the allowable costs of purchased power as defined in section 4909.159 * * *."

    R.C. 4905.01(E) defines "delivery cost" as "the cost of delivery of fuel, to be used for the generation of electricity, from the site of production directly to the site of an electric generating facility."

    R.C. 4905.01(F) defines "acquisition cost" as "the cost to an electric light company of acquiring fuel for generation of electricity. In the case of a fuel supply owned by the company, such term shall also include the cost of legally extracting the fuel and its handling prior to its shipment to the company. In the case of a coal supply owned or controlled in whole or in part by the company, such term shall not exceed a price that is, in the judgment of the public utilities commission, reasonable when compared to the average cost per million British thermal units of similar quality coal purchased from all independent like mining operations under similar term contracts during the same period. In determining a reasonable price for coal from a coal supply owned or controlled in whole or in part by the company, the public utilities commission shall consider the use of:

    "(1) Capital by the developer of the mining operation in a manner that did not:

    "(a) Take into account intermediate or long-term trends in the coal mining industry; or

    "(b) Incorporate a design consistent with long-term dependability; and

    "(c) Take into account the intermediate or long-term cost and reliable energy supply interests of the company's customers; or

    "(2)  Ineffective operating techniques. Such term does not embrace any associated cost including, but not limited to, delivery cost, the cost of handling the fuel after its delivery to such facility, the cost of such processing, readying, or refinement of the fuel as may be necessary in order to use the fuel to generate electricity, or the cost of disposing of any residue of such fuel after it has been so used. To the extent the washing of coal is required, by law or rule, to remove or reduce sulfur compounds or any other impurity, 'acquisition cost' includes the cost of such washing."

4    Ohio Adm. Code 4901:1-11-10 provides in part:

    "(G) Audit procedures for fuel supplies owned or controlled by the electric utility.

    "The procedures which the auditor shall follow in reviewing

fuel supplies owned or controlled by the electric utility are:

"* * *

"(12) Develop for each fuel supplier which is owned or controlled by the electric utility comparisons of the cost per million British thermal units of fuel supplied to the electric utility during the EFC audit period to the cost per million British thermal units for similar quality coal purchased by the electric utility during the same period from all independent like mining operations under similar term contracts."

5     This difference amounted to $1,465,757 in PUCO No. 93-01-EL-EFC.

6     R.C. 4905.301 provides:

"Nothing in this section shall preclude the use of a fuel component that creates positive efficiency incentives for minimizing the costs of electric service."

R.C. 4905.69(C) provides:

"The public utilities commission shall promulgate a rule that *** [e]stablishes incentives, in terms of costs that may be recovered by electric light companies pursuant to a fuel component for the implementation and employment by such companies of efficient fuel procurement and utilization practices ***."